UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

Michael Ensley and A&M Consulting, LLC )
)
      Plaintiffs, )
)
v. )
)
Ben O. Turnage; Gemstone Foods, LLC; ) Case Number:
Gemstone Holdings, LLC; Gemstone )
Ventures Decatur, LLC; Gemstone Ventures, )
LLC; Jamas Capital Management, LLC; and )
RCF, LLC, )
)
      Defendants. )

## COMPLAINT

### NATURE OF SUIT

1.    Plaintiff Michael "Mike" Ensley and A&M Consulting, LLC bring this action against Ben O. Turnage, Gemstone Foods, LLC, Gemstone Holdings, LLC, Gemstone Ventures Decatur, LLC, Gemstone Ventures, LLC, Jamas Capital Management, LLC, and RCF, LLC (collectively "Defendants") for compensatory damages, punitive damages, and other relief based on claims of breach of contract, quantum meruit, fraud, unjust enrichment, and promissory estoppel.

### PARTIES

2.    Michael Ensley is a citizen of Georgia and a resident of Epworth, Georgia.

3.    A&M Consulting, LLC ("A&M Consulting") is a Georgia corporation with its principal place of business in Epworth, Georgia. Mike Ensley owns 100% of A&M Consulting, LLC.

1387226.15

4. Ben O. Turnage is a resident of the state of Mississippi with a last known address of 2540 Eastover Drive, Jackson, Mississippi. Turnage is the founder, owner, and chief executive officer of Jamas Capital Management, LLC. Turnage also is an officer, director, and manager of Gemstone Holdings, LLC; Gemstone Foods, LLC; Gemstone Ventures, LLC; Gemstone Ventures Decatur, LLC (also called Gemstone Ventures Decatur I) ; and RCF, LLC (also called Gemstone Ventures Decatur II).

5. Jamas Capital Management, LLC is a Mississippi corporation with its principal place of business in Jackson, Mississippi. Jamas is a private investment firm that operates numerous companies, including Gemstone Foods, LLC.

6. Gemstone Holdings, LLC ("Gemstone Holdings") is a Mississippi corporation with its principal place of business in Jackson, Mississippi. Upon information and belief, Gemstone Holdings, LLC is a holding company for Gemstone Foods, LLC, Gemstone Ventures, LLC, and Gemstone Ventures Decatur, LLC.

7. Gemstone Foods, LLC ("Gemstone Foods") is a Mississippi corporation with its principal place of business in Decatur, Alabama. Gemstone Foods operates two "cutting" or poultry processing plants. One is located 641 Holly Street Northeast in Decatur, Alabama (the "Holly Street Plant"). The other cutting plant is located at 805 McEntire Lane in Decatur, Alabama (the "McEntire Plant").

8. Gemstone Ventures Decatur, LLC ("Gemstone Ventures Decatur") is a Mississippi corporation. Upon information and belief Gemstone Ventures Decatur, LLC owns the property and fixtures of the Holly Street Plant located at 641 Holly Street Northeast in Decatur, Alabama. Gemstone Ventures Decatur, LLC wholly owns RCF, LLC.

9. Gemstone Ventures, LLC ("Gemstone Ventures") is a Mississippi corporation. Upon information and belief Gemstone Ventures, LLC owns the property, fixtures, equipment, and other assets of the McEntire Plant located at 805 McEntire Lane in Decatur, Alabama.

10. RCF, LLC ("RCF") is an Alabama corporation that was formed on October 14, 2011 and has its principle place of business in Decatur, Alabama. RCF was owned by James A. King, III and William A. Heim, II. RCF originally owned and operated the Holly Street Plant.

11. In March 2013, Gemstone Ventures Decatur acquired ownership of RCF. The RCF Plant had been closed for 9-10 months when it was acquired. Ben Turnage is the current Manager of RCF. RCF is a services company that provides plant, labor, accounting and other services to Gemstone Foods and its customers. RCF's assets include, but are not limited to, the state and local licenses, utility accounts, USDA accounts, and other accounts of the prior operator of the Holly Street Plant.

## JURISDICTION AND VENUE

12. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1332 because there is diversity of citizenship and the amount in controversy exceeds $75,000.00.

13. Venue is proper in this Court pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claim occurred in the judicial district and, in particular, Decatur, Alabama.

## STATEMENT OF FACTS

14. Mike Ensley has worked in the poultry processing industry for more than 35 years. He started working for Tyson Foods, Inc. ("Tyson") in 1982. Ensley received numerous promotions at Tyson, retiring in 2009 with the title of Vice President of Operations-Retail Fresh Division. Ensley's experience and achievements with Tyson included, but were not limited to,

mastering the knowledge of live production and plant processing operations, implementing company-wide quality assurance policies and specifications, implementing the first original HACCP plant jointly with the USDA, maintaining excellent customer satisfaction percentages, directing in-house logistics and production teams, and designing and starting up the first net weight fresh plant in the United States. As Vice President of Operations-Retail Fresh Division, Ensley managed six case ready plants and was responsible for 8,000 hourly employees.

15. During his tenure with Tyson, Ensley learned a great deal about the poultry processing industry, including but not limited to how to calculate production processing costs, forecast sales, forecast production volumes, calculate profit margins, and understand the poultry market.

16. Using his knowledge, Ensley developed a model for determining whether a particular aspect of poultry processing could be profitable based on costs and quality, as well as the market's supply and demand.

17. In 2012, Ensley started a consulting business named A&M Consulting. A&M Consulting is a Georgia corporation. Through A&M Consulting, Ensley provided consulting services to numerous businesses in the poultry processing industry, including Victory, Prime Pak, and Dallas USA. He was also employed by Diamond Foods.

18. In 2012, Ensley contacted Turnage and the two of them discussed the idea of acquiring and operating a chicken processing plant that Ensley was employed for at the time, Diamond Foods. Despite extensive efforts, they were not able to conclude a deal for the acquisition of Diamond Foods.

19. At that time, Turnage did not have any experience in or knowledge about the poultry processing industry. However, Ensley advised Turnage that he believed he could help

him acquire and profitably operate a poultry processing business by focusing on cutting oversized chicken tenders to portions desired by certain customers and selling the additional "trim" to other processors. Turnage expressed that he remained interested in acquiring a chicken processing business.

### Turnage and Ensley Start Gemstone Foods, LLC

20.     In early 2012, A&M Consulting consulted for RCF, which was commonly known as River City Foods.

21.     River City Foods owned and operated the Holly Street Plant in Decatur, Alabama. RCF lost its one customer, Keystone, and decided to cease operations at that plant. After the loss, RCF closed down the Holly Street Plant.

22.     After the Holly Street Plant closed, Ensley approached Turnage about purchasing RCF. Turnage had no knowledge of RCF and would not have learned about the opportunity but for Ensley telling him about it.

23.     Turnage became interested in the deal to acquire RCF and to engage Ensley for the deal and to start up and operate the plant. The owners of RCF, James A. King, III and William A. Heim, II, did not trust Turnage, but they trusted Ensley because of their long-standing relationship with him.

24.     To get the operations started, Turnage agreed, among other things, to provide the initial capital to purchase the property, facilities, and machinery, and to provide the startup capital until the company became profitable. Turnage's initial capital contribution was minimal because King and Heim agreed to finance much of the acquisition. King and Heim would not have agreed to finance a significant part of the acquisition but for their relationship with Ensley.

As a result, Turnage received a substantial benefit because of Ensley's relationship and efforts to get additional financing for the deal.

25. Turnage agreed that the new company would pay Ensley, through A&M Consulting, a regular monthly consulting fee as well as a bonus of 6% of the net income of the business. For his part, Ensley agreed that, among other things, he would provide his expertise and time to set up the plant, hire and train employees, manage the operations, secure the chicken to be cut, and find customers to buy the finished product.

26. In relying on this promise, Ensley had to forego other opportunities for A&M Consulting to provide consulting services to companies which would have generated significant income for A&M Consulting (and ultimately Ensley).

27. In February and March 2013, Turnage formed Gemstone Foods, Gemstone Holdings, and, Gemstone Ventures Decatur by filing certificates of formation with the Mississippi Secretary of State. Upon information and belief, Turnage, by and through Gemstone Holdings, owns 100% of Gemstone Foods and Gemstone Ventures Decatur.

28. Gemstone Ventures Decatur acquired the Holly Street Plant and ownership of RCF. Gemstone Ventures Decatur now owns 100% of RCF.

29. Mike Ensley was named the President of Gemstone Foods as a consultant to Gemstone Foods through A&M Consulting. Despite continued misrepresentations and promises, Turnage never filed amended formation documents to include Ensley as President. Upon information and belief, Gemstone Foods is a single member LLC.

30. RCF coordinates, receives, unloads, processes, sizes, packs, stores, reloads, and creates bills of lading and invoices to and for Gemstone Foods. Gemstone Foods paid RCF a fee per pound for portions, nuggets, and tenders. Gemstone Holdings; Gemstone Foods; RCF;

Gemstone Ventures Decatur; and Gemstone Ventures (after it was created) are collectively referred to as "Gemstone."

31. After the purchase of RCF and its assets, Ensley helped with hiring employees for Gemstone in preparation to open the plant. As a consultant, Ensley utilized his years of experience in the poultry industry, as well as some pricing formula he had developed, to structure a profitable business model for Gemstone.

32. Ensley also secured suppliers of chicken breast and customers to purchase the cut breasts, tenders, as well as the trim and other by-products. He was assisted in this effort by Annette Carr and her company, AAA Foods.

33. The startup of Gemstone required Ensley to often work seven days a week and up to 16 or more hours in a day. Sometimes Ensley had to stay up all night to coordinate the shipping of the meat. This work schedule continued for more than a year. As a result, Ensley spent almost all of his time in Decatur instead of at his home in Georgia.

34. In June 2013, Ensley was forced to reduce his work schedule for medical reasons. Ensley's focus was narrowed almost exclusively to sales, and Mark Welborn's role was modified to take over logistics and production until Ensley's health improved. Ensley and Turnage agreed that Ensley's salary would be reduced during that time.

35. Because Gemstone was a new company and did not have any history with suppliers or customers, Gemstone did not have any credit with chicken suppliers. As a result, Gemstone relied upon Ensley's and Carr's relationships (including AAA Foods' credit) to purchase chicken for processing.

36. During the first year of operations, Gemstone paid A&M Consulting on a monthly basis for the services provided by Ensley.

37. On multiple occasions, Turnage told suppliers and customers that Ensley was his business "partner" and an "owner" of Gemstone. By doing so, Turnage used Ensley's respected reputation in the industry to convince suppliers to deliver products to Gemstone (mostly on credit) and also to secure customers for Gemstone who were familiar with Ensley's quality of product.

38. From April 2013 through April 2014, Gemstone made a profit in excess of $4 million dollars. From January 2014 through December 2014 Gemstone made a profit in excess of $12 million dollars.

39. Also, in January 2014, Ensley and Turnage agreed that going forward Ensley would become employed by Gemstone and that Gemstone would pay him a salary as President.

40. Turnage and Ensley agreed that Gemstone would pay Ensley an annual salary of $325,000.00 per year.

41. Turnage and Ensley also agreed that Gemstone would pay A&M Consulting a monthly bonus based on the net income of the consolidated income of the Gemstone business, including Gemstone Foods, Gemstone Ventures Decatur, and RCF, as well as other processing entities and future purchasing companies.

42. Finally, Turnage and Ensley agreed that Ensley would participate in a company-paid executive savings plan that required Gemstone to allocate 10% of the consolidated net (after tax) annualized profit to an annual executive savings plan.

43. On January 22, 2014, Turnage sent Ensley an email confirming the terms of his compensation as an employee of Gemstone, attached as Exhibit A. The e-mail stated the following:

Salary:

- $325,000 per annum
- Effective January 5, 2014
- Payable monthly or with regular pay periods as desired

Bonus:
- Calculated based on 6% of the reported net income of the consolidated income of Gemstone Foods, Gemstone Ventures Decatur I & II (RCF) and other processing entities and future purchasing companies
- Payable in cash
- First bonus paid April 30, 2014 for the first fiscal year that started April 2013 and ends April 30, 2014
- Bonus paid monthly thereafter

Executive Saving Plan:
- 10% of the consolidated net (after tax) annualized profit is to be allocated via Employment Contract for the Executive Saving Plan on an annual basis, consistent with year end being April 30th and cumulative each and every year, beginning April 30, 2013 and first year being April 30, 2014, second year being April 30, 2015, third year being April 30, 2016 and fourth year being April 30, 2017. Upon completion of year ending April 30, 2017 (or termination of employment) the cumulative total shall be earned and allocated for annual cash distribution in 3 to 5 equal payments (depending on Mike's discretion) to be made annually following termination of employment and continuing each year thereafter until paid in full. Recipient is responsible for any income or other payroll taxes that may be due upon receipt of distribution.

44. The agreement regarding the promised executive savings plan and terms of employment became effective as of January 5, 2014.

45. In late February and early March 2014, Ensley considered ending his relationship with Gemstone for a number of reasons, including the long hours of work, stress, health issues, and the lack of appreciation by Turnage. Ensley also received an offer for another consulting opportunity that would pay him a similar amount of money and would be less stressful.

46. Ensley told Turnage of his opportunity and intent to leave Gemstone. In response, Turnage offered to increase the bonus amount from 6% to 10% of the reported net income of the companies.

47. Based on these promises, Ensley agreed to continue working with Gemstone, and he and Turnage amended their agreement to increase the bonus payments to 10% of net income.

48. Turnage made the promise in an effort to keep Ensley working for Gemstone so that Gemstone could utilize Ensley's expertise to start up a new processing plant because Turnage knew that he could not start up, manage, or operate a processing plant without Ensley's industry expertise and knowledge.

### Turnage and Ensley Start Gemstone Ventures

49. Because Gemstone was so successful, Turnage and Ensley agreed that Gemstone should open another processing facility. On the same day that Turnage emailed Ensley's employment terms, January 22, 2014, Turnage also formed Gemstone Ventures, LLC by filing formation documents with the Mississippi Secretary of State.

50. Gemstone Ventures, LLC and Gemstone Foods, LLC, are both owned by Gemstone Holdings, LLC, which is wholly owned by Turnage.

51. Upon information and belief, Gemstone Ventures acquired the property and facilities located at 805 McEntire Lane in Decatur, Alabama.

52. In an effort to keep Ensley working for Gemstone and not return to his consulting business, Turnage intentionally misled Ensley by promising the compensation and benefits in the email, as well other benefits.

53. Ensley continued to search for additional processing plants and businesses to acquire. Ensley evaluated several potential plants and locations, which included visiting various operations in Danville, Arkansas; Alma, Arkansas; Stillwell, Oklahoma; Rogers, Arkansas; south Georgia; Athens, Alabama; and Cherokee, Alabama.

54. Ensley was involved in and responsible for Gemstone Ventures' acquisition of the McEntire Plant in Decatur, Alabama. Ensley himself located the McEntire Plant through his relationship with Roger Anders. But for Ensley's relationship and his efforts, Gemstone and Turnage would never have known about or acquired the McEntire plant.

55. Shortly after receiving the January 22, 2014 email, Ensley began preparing the new McEntire processing plant to be operational by hiring employees, training them, and getting the equipment and plant ready. Ensley continued to rely upon Turnage's representations and remained employed at Gemstone.

56. The new processing facility opened and began operating on April 7, 2014.

57. Pursuant to the agreement, on May 30, 2014, Gemstone paid Ensley a cumulative amount for the monthly bonuses he earned from April 2013 through April 2014. As set forth in their agreement, the bonus amounted to 10% of the reported net income of the consolidated income of Gemstone Foods, RCF, Gemstone Ventures Decatur, and Gemstone Ventures.

58. Each month thereafter, Gemstone paid Ensley his monthly bonuses for May, June, July, August, and September of 2014. Each time the bonus amounted to 10% of the reported net income of the consolidated income of Gemstone Foods, RCF, Gemstone Ventures Decatur, and Gemstone Ventures.

59. Ensley also received his regular salary through November 15, 2014.

60. In June 2014, Turnage presented Ensley with a "Founder's" retirement and consulting package that provided for Ensley's employment with Gemstone to terminate effective November 30, 2014, but for Ensley to continue serving Gemstone as a consultant. Based on all Ensley had done for Turnage and Gemstone, as well as future services, Turnage proposed paying Ensley over $3,000,000.00 in certain fixed amounts on specific dates and a bonus based on "net"

profitability in exchange for Ensley's consulting services and compliance with numerous restrictive covenants that effectively prevented him from working in the poultry processing industry.

61. These terms and conditions were unacceptable to Ensley due to the high degree of potential for discretionary abuse by Gemstone associated with the calculation of the "net" income figures upon which the compensation would be based.

62. Turnage terminated Ensley's employment with Gemstone on November 30, 2014.

63. Since Ensley's termination, Gemstone and Turnage have refused to pay Ensley his salary for the period of November 15 through November 30, 2014, as required by their agreement and for the actual employee services performed by Ensley during this time.

64. Gemstone and Turnage failed to contribute 10% of the consolidated net (after tax) annualized profit for the 2013-2014 year, to the Executive Saving Plan as required by the Employment Agreement.

65. Gemstone and Turnage also failed to pay Ensley the bonuses he earned for October 2014 and November 2014, as required by the Employment Agreement. Upon information and belief, Ensley's unpaid bonus payments exceed $140,000.00.

66. Pursuant to the agreement, Ensley has demanded to be paid the proceeds from the Executive Saving Plan in three equal installments, but Gemstone and Turnage have refused to pay Ensley.

## COUNT I—BREACH OF CONTRACT

67. Ensley reasserts and realleges all of the foregoing paragraphs in his Complaint as though fully set forth herein.

68.     As of January 2014, a valid employment contract exists between Ensley, Turnage, and Gemstone (the "Employment Agreement"). Pursuant to The Employment Agreement, Ensley was to receive an annual salary, payable in monthly installments. Additionally, Ensley was to receive monthly bonus payments in the amount of ten percent (10%) of the net income of the consolidated income of Gemstone Foods and Gemstone Ventures Decatur, RCF, and Gemstone Ventures. Finally, Ensley was entitled to participate in the Executive Savings Plan to which Gemstone was obligated to contribute 10% of the consolidated net (after tax) annualized profit.

69.     Ensley performed under the contract through November 30, 2014.

70.     Gemstone and Turnage breached the Employment Agreement by refusing to pay Ensley his salary for November 15-30, 2014, his monthly bonus payments for October and November of 2014, and the full amount of his Executive Savings Plan owed for the first year, which vested on April 30, 2014.

71.     As a direct and proximate result of Defendants' conduct, Ensley has suffered damages, including but not limited to lost compensation and benefits that he earned during his employment with Gemstone, mental anguish, and emotional distress.

WHEREFORE, PREMISES CONSIDERED, Ensley demands judgment against Defendants in an amount to be determined by the trier of fact, plus any other relief that the Court deems proper.

### COUNT II—QUANTUM MERUIT

72.     Ensley reasserts and realleges all of the foregoing paragraphs in his Complaint as though fully set forth herein.

73. Ensley agreed to and did, in fact, work with Turnage to develop Gemstone, providing his expertise developing the business model, and recruiting employees, suppliers, and customers. In exchange, Defendants promised to pay Ensley an annual salary of $325,000.00, monthly bonus payments in the amount of ten percent (10%) of the net income of the consolidated income of Gemstone Foods, Gemstone Ventures Decatur, RCF, and Gemstone Ventures, contributions to an Executive Saving Plan in the amount of 10% of the consolidated net (after tax) annualized profit, and two weeks of paid vacation time.

74. Defendants knowingly accepted Ensley's services and the resulting benefits of such services.

75. Ensley had a reasonable expectation of payment for his services.

76. Ensley was never paid his full salary, bonuses for October 2014 or November 2014, or his Executive Saving Plan benefits.

WHEREFORE, PREMISES CONSIDERED, Ensley demands judgment against the Defendants in an amount equal his unpaid salary, bonuses, and benefits due under the Executive Saving Plan.

### COUNT III - UNJUST ENRICHMENT (All Defendants)

77. Ensley reasserts and realleges all of the foregoing paragraphs in his Complaint as though fully set forth herein.

78. Defendants have been unjustly enriched because they knowingly accepted the personal services and work performed by Ensley, the profits earned by Gemstone as a result of the personal services and work performed by Ensley, and the growth in the value of the Defendant LLCs as a result of the personal services and work performed by Ensley. Defendants never fully compensated Ensley for his performance of services.

79. Ensley conferred a direct benefit on Defendants by providing personal services and work under the belief that he would ultimately receive all of the compensation and benefits contracted for in the 2014 Employment Agreement.

80. Ensley reasonably relied on the misrepresentations of the Defendants to his detriment.

81. The Defendants acceptance of Ensley's personal services and work is unjust.

WHEREFORE, PREMISES CONSIDERED, Ensley demands judgment against the Defendants for the full amount of compensatory damages, interest, costs, attorneys' fees, and other relief to which he is entitled under the applicable law.

## COUNT IV – CIVIL CONSPIRACY

82. Ensley reasserts and realleges all of the foregoing paragraphs in his Complaint as though fully set forth herein.

83. The Defendants conspired to deny Ensley the compensation and benefits he was due, to fraudulent induce and promise him compensation and benefits as set forth above, and to wrongfully and intentionally refuse to pay him.

84. As a direct and proximate result of the Defendants' actions, Ensley has suffered damages, including but not limited to mental anguish and emotional distress.

85. WHEREFORE, PREMISES CONSIDERED, Ensley demands judgment against the Defendants for the full amount of compensatory damages, punitive damages, interest, costs, attorneys' fees, and other relief to which he is entitled under the applicable law.

## COUNT V – BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

86. Ensley reasserts and realleges all of the foregoing paragraphs in his Complaint as though fully set forth herein.

87. Ensley and Defendants entered into valid and binding agreements.

88. Defendants breached the covenant of good faith and fair dealing in failing to perform under the agreements and intentionally engaging in practices which denied Ensley the full benefits of the terms agreed to by the Defendants.

89. Defendants failed to pay Ensley his salary for November 15-30, 2014, his monthly bonus payments for October and November of 2014, and the full amount owed under his Executive Savings Plan, which vested on April 30, 2014.

90. As a direct and proximate result of Defendants' breach of the covenant of good faith and fair dealing, Ensley has been damaged.

91. WHEREFORE, PREMISES CONSIDERED, Ensley demands judgment against the Defendants for the full amount of compensatory damages, punitive damages, interest, costs, attorneys' fees, and other relief to which he is entitled under the applicable law.

## JURY DEMAND

Plaintiff demands trial by jury.

Respectfully submitted this 14th day of July, 2015.

*Katie Clements*

Katie Clements
Balch & Bingham LLP
Post Office Box 306
Birmingham, AL 35201-0306
Telephone: (205) 226-8734
Facsimile: (205) 488-5711
E-mail: kclements@balch.com

M. Jefferson Starling, III
Balch & Bingham LLP
Post Office Box 306
Birmingham, AL 35201-0306
Telephone: (205) 226-3406
Facsimile: (205) 226-8799
E-mail: jstarling@balch.com

*Attorney for Michael Ensley and A&M Consulting, LLC*