FILED

2022 Feb-11  PM 03:26
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| **GEMSTONE FOODS, LLC et al.,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | )    **Case No.: 5:15-cv-02207-MHH** |
| | ) |
| **AAA FOODS ENTERPRISES, INC.** | ) |
| **et al.,** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| **MICHAEL ENSLEY et al.,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | )    **Case No.: 5:15-cv-01179-MHH** |
| | ) |
| **BEN O. TURNAGE et al.,** | ) |
| | ) |
| **Defendants.** | ) |

## <u>MEMORANDUM OPINION – VOLUME I</u>

This is a RICO case with related state-law claims and counterclaims.  At times, the parties worked together in the poultry processing industry.  At times, the parties competed – and continue to compete – in the industry.  The poultry processing community is small and tight-knit.  The key to success in the industry is

1

building and maintaining relationships and keeping power players like Tyson and Pilgrim's Pride happy.  This case is about broken relationships and betrayals and the consequences that flow from them.

In 2013, an investor and newcomer to the poultry processing industry, Ben Turnage, joined forces with an industry household name, Mike Ensley, and started the two companies named as plaintiffs in this action:  Gemstone Foods, LLC and RCF, LLC.  RCF stands for River City Foods.  Gemstone and RCF allege that Mr. Ensley, the team of employees he recruited for the Gemstone/RCF poultry processing operation in North Alabama, and the broker who supplied the chicken that RCF processed, Annette Carr (who worked under the business name AAA), together injured the plaintiffs by having Gemstone pay fraudulently inflated invoices for poultry, diverting business from RCF to companies the defendants created, implicating RCF in a fraudulent labeling scheme, stealing Gemstone property and information, and ultimately starting Farm Fresh Foods in 2015 to openly and directly compete with Gemstone and RCF.  The defendants deny the allegations and counterclaim for commissions allegedly still owed under contract and quasi-contract theories.

The case is before the Court on motions for summary judgment filed by the plaintiffs and the defendants pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Defendants A&M Consulting, LLC; Farm Fresh Foods, LLC; Michael

Ensley; Annette Carr; AAA Foods Enterprises, Inc.; Shane Pass; Mark Welborn; Eddie Hill; Gary Hill; Debra Campos; and Matthew Wester have moved for summary judgment as to Gemstone's/RCF's claims against them. (Doc. 414; Doc. 417; Doc. 419). Ben Turnage; Gemstone Foods, LLC; Gemstone Holdings, LLC; Gemstone Ventures Decatur, LLC; Gemstone Ventures, LLC; RCF, LLC; and Jamas Capital Management, LLC have moved for summary judgment as to Michael Ensley's and A&M Consulting's claims for compensation. (Doc. 424; Doc. 428). Gemstone and RCF also have moved for summary judgment as to all counterclaims. (Doc. 426).[1]

This memorandum opinion addresses all motions. We begin with a description of the standard that the Court must use to evaluate the parties' summary judgment motions. We then turn our attention to the evidence. Finally, we discuss the elements of the parties' claims under federal and state law and evaluate the evidence under those legal standards to determine which claims a jury must decide and which claims the Court may resolve as a matter of law.[2]

---

[1] The record cites in this memorandum opinion are to docket entries in case 15-2207. Unless otherwise noted, as used in this opinion, "the plaintiffs" are Gemstone and RCF, the plaintiffs/counterclaim defendants in case 15-2207. "The defendants" are the defendants in case 15-2207, some of whom also are counterclaim plaintiffs in case 15-2207. When discussing the claims in case 15-1179, the Court will provide details about the parties in that case.

[2] Michael Pepper, a staff attorney, did yeoman's work to prepare a draft of this opinion. Natalie Steiert, a law clerk, also contributed significantly to this opinion. The Court is grateful for their efforts.

## I.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  To demonstrate that a genuine dispute as to a material fact precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A).  "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).  When considering a summary judgment motion, a district court must view the evidence in the record and draw reasonable inferences from the evidence in the light most favorable to the non-moving party.  *Sconiers v. Lockhart*, 946 F.3d 1256, 1260 (11th Cir. 2020).

---

The parties in this case are preparing for a two-day mediation with Judge Ott in two weeks.  The parties must submit mediation statements to Judge Ott by February 14, 2022.  (Doc. 535).  To help the parties meet their deadline and give them as much information about the Court's rulings on their summary judgment motions as possible, the Court is issuing this opinion in segments.  This first segment contains a brief overview of the case, the summary judgment standard, and a discussion of the summary judgment evidence.  After the Court completes its analysis of the parties' claims and defenses, for clarity in the record, the Court will enter an omnibus opinion.

"The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether [any] of the parties deserves judgment as a matter of law on the facts that are not disputed.  The Court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration." *Alabama Municipal Ins. Corp. v. Scottsdale Ins. Co.*, 297 F. Supp. 3d 1248, 1252 (N.D. Ala. 2017) (quoting *Southern Pilot Ins. Co. v. CECS, Inc.*, 52 F. Supp. 3d 1240, 1242-43 (N.D. Ga. 2014)).

## II.

This case is sprawling and complex factually and procedurally.[3]  In a nutshell, Gemstone and RCF allege that, at the urging of Mr. Ensley, Mr. Turnage became involved in the poultry processing industry.  And at the urging of Mr. Ensley, Mr. Turnage agreed to have Annette Carr and her company AAA Foods Enterprises, Inc. source the poultry that RCF would process for a fee of one cent or two cents per pound of meat.  Mr. Ensley, who served as Gemstone's president, failed to mention to Mr. Turnage that Ms. Carr was his girlfriend.  Mr. Ensley also failed to mention to Mr. Turnage that, while he was serving as Gemstone's president, he was sending customer orders to another poultry processing company in Texas.  Gemstone

---

[3] The Court's December 13, 2021 order to show cause describes most of the procedural history of this case.  (*See* Doc. 468, pp. 7–40).

contends that Ms. Carr submitted fraudulently inflated invoices to Gemstone for the meat she sourced, and Mr. Ensley ensured Gemstone paid the invoices expeditiously. While they were working for the companies, some members of the management team for Gemstone and RCF created fake RCF documents to support their separate poultry cross-docking and inspection business that allegedly diverted business from Gemstone and implicated RCF in fraudulent poultry labeling that drew the attention of Canadian customs officials and the USDA.  And, while they were working at Gemstone, the entire management team that Mr. Ensley recruited made plans to start Farm Fresh Foods with property, information, and customers taken from Gemstone. After he left Gemstone, Mr. Ensley became a consultant to FFF through his company, A&M Consulting.  Matthew Wester, one of the defendants who started the competing cross-docking business and later became one of the owners of FFF, brought from Gemstone to FFF a laptop that contained confidential emails, documents, and proprietary information.

Ms. Carr, AAA, Mr. Ensley, and A&M contend that Gemstone still owes them money.  Ms. Carr and AAA allege that Gemstone has not paid Ms. Carr's fees for services rendered in late 2014 and early 2015.  And Mr. Ensley contends that Gemstone still owes him compensation due under his employment agreement with Gemstone, which Gemstone should pay to A&M Consulting.

With that background, we turn to the details of the parties' relationships and business dealings.

### *The Start of Gemstone*

Mr. Turnage is a businessman with decades of experience in real estate and venture capital.  He identifies and invests in distressed assets.  (Doc. 422-9, p. 6, tpp. 11–13).  Mr. Ensley is a veteran of the poultry industry who retired from Tyson Foods in 2009 as Vice President of Operations and then started a consulting business. (Doc. 422-2, p. 2, ¶¶ 2–3; Doc. 422-18, p. 7, tpp. 21–22).[4]

In 2012, Mr. Ensley was working for Diamond Foods, a struggling poultry processing company in need of an investor.  (Doc. 422-2, p. 2, ¶¶ 4–5; Doc. 422-9, p. 7, tpp. 16–17; Doc. 422-18, p. 14, tp. 51).  To help Diamond Foods become more profitable, Mr. Ensley joined forces with Annette Carr to hire more than 100 new employees and add 10 customers, including Tyson, Cargill, and Land O'Frost.  (Doc.

---

[4] Tyson Foods is a key player in the poultry industry.  Mr. Ensley worked for the company for nine years.  (Doc. 422-18, p. 7, tp. 22).  Mr. Ensley supported Gold Creek after he left Tyson.  According to Mr. Ensley, he was called the president of the company, but he really was a consultant.  (Doc. 422-18, pp. 7–8, tpp. 24–25).  While he worked with Gold Creek, Mr. Ensley worked with Annette Carr to locate customers.  (Doc. 422-18, p. 9, tpp. 29–30).  Mr. Ensley parted ways with Gold Creek in the summer of 2012.  (Doc. 422-18, p. 9, tp. 31).  Gold Creek tried to convince Mr. Ensley to stay with the company, offering him a deal not to go to another company, but he refused.  (Doc. 422-18, p. 9, tp. 32; Doc. 422-18, p. 11, tp. 39; Doc. 422-18, p. 12, tp. 42).  After he left Gold Creek, the company sued Mr. Ensley for breaching a non-compete agreement concerning Burger King chicken tenders.  (Doc. 422-18, pp. 9–11, tpp. 32–40).  Mr. Ensley did not feel that the agreement was binding on him because it was just "a one little page deal."  (Doc. 422-18, p. 12, tp. 41).  After he left Gold Creek, Mr. Ensley consulted with Victory Foods for a few months before joining Diamond Foods at the request of his former Tyson co-worker, Mark Welborn.  (Doc. 422-18, p. 12, tpp. 41–44).

422-18, pp. 12–14, 16, tpp. 44–45, 48–49, 59).[5]   Ms. Carr sourced chicken for Diamond Foods and sold the chicken that Diamond Foods portioned from the meat that she supplied.  (Doc. 525-1, p. 11, tpp. 42–44).[6]   Through business acquaintances, Mr. Ensley learned about Ben Turnage.  (Doc. 422-18, pp. 14–15, tpp. 51–55).  Mr. Ensley thought Mr. Turnage might be the investor that Diamond Foods needed even though Mr. Turnage "didn't know anything about the chicken business."  (Doc. 422-18, p. 16, tp. 60).  So, Mr. Ensley introduced Mr. Turnage to the chicken business.  (Doc. 422-18, p. 17, tp. 62).

Mr. Turnage and Diamond Foods were unable to agree to terms, so Mr. Turnage did not become involved with the company, but Mr. Ensley had sold Mr. Turnage on the poultry processing industry.  (Doc. 422-1, pp. 16–17, tpp. 53–54; Doc. 422-2, p. 2, ¶ 6; Doc. 422-18, p. 13, tp. 45).  Mr. Ensley identified River City Foods as an alternative investment opportunity.  RCF operated a poultry processing plant in Decatur, Alabama.  (Doc. 422-1, p. 17, tpp. 55–56; Doc. 422-2, p. 2, ¶ 6).  Mr. Turnage agreed that RCF was a promising opportunity.  He formed Gemstone Foods, LLC to purchase RCF and take over its poultry processing operation under

---

[5] At Diamond Foods, Mr. Ensley worked with Mr. Welborn, Deborah Campos, Matthew Wester, Shane Pass, and Brad Lenoir.  (Doc. 422-18, p. 15, tp. 56).

[6] Diamond was a captive processor for Ms. Carr.  Ms. Carr brought chicken to Diamond Foods; Diamond Foods processed the meat; Ms. Carr sold the portioned meat; and Ms. Carr paid Diamond a fee for its services.  (Doc. 525-1, pp. 11–12, tpp. 44–45).  Ms. Carr did not have a written contract with Diamond Foods.  (Doc. 525-1, p. 12, tp. 45).  Ms. Carr worked with Diamond Foods because Mr. Ensley asked her to; she did not like the work.  (Doc. 525-1, p. 12, tp. 47).

Mr. Ensley's leadership. (Doc. 422-1, p. 18, tpp. 58–59; *see* Doc. 422-18, pp. 23, 38, 40, tpp. 85, 145, 153).

Mr. Ensley became president of Gemstone. (Doc. 422-18, pp. 23, 40, tpp. 85, 153). His starting annual salary was $200,000. (Doc. 422-1, p. 29, tp. 103). His salary later increased to $325,000 annually with monthly bonuses of 10% of the business's after-tax profit. (Doc. 422-1, pp. 29, 41, tpp. 104, 152–53).

Mr. Ensley left Diamond Foods on March 9, 2013 and immediately started securing business for Gemstone. (Doc. 422-18, pp. 13, 38, tpp. 47, 145–47). That month, he reached an agreement with Tyson Foods for Gemstone to provide portioning services for Tyson once Gemstone became operational. (Doc. 422-2, p. 3, ¶ 8; Doc. 422-18, p. 38, tpp. 145–47). Realizing that he needed to find a way to fill Tyson's requirements until RCF was operational, Mr. Ensley consulted with Ms. Carr about her customer base to identify an interim processor. (Doc. 422-2, p. 3, ¶ 9). On Ms. Carr's recommendation, Mr. Ensley introduced Tyson Foods to Dallas USA Foods, a portioning company in Texas. (Doc. 422-2, p. 3, ¶ 9; Doc. 422-18, p. 13, tp. 47). After visiting the Texas plant with a Tyson Foods representative and obtaining Tyson's approval, Mr. Ensley arranged for Dallas USA to fill Tyson's orders while Gemstone got up and running. (Doc. 422-2, p. 3, ¶ 9; Doc. 422-18, p. 38, tpp. 146–47; Doc. 422-19, pp. 20, 37–38). Dallas USA began portioning chicken

breasts and sizing tenders for Tyson Foods in early 2013.  (Doc. 422-19, p. 20).[7]  Mr. Ensley did not tell Mr. Turnage that he had arranged for Dallas USA to fill Tyson Foods's orders in 2013.  (Doc. 422-1, p. 25, tp. 89).

To staff the Decatur plant, Mr. Ensley introduced Mr. Turnage to several individuals who were working for Diamond Foods.  (Doc. 422-9, p. 10, tpp. 26–28). Gemstone hired several of them to senior management positions:  defendant Mark Welborn as general manager, (Doc. 422-4, pp. 9, 50, tpp. 29–30, 195–96); defendant Shane Pass as head of quality control, (Doc. 422-6, p. 10, tp. 34); defendant Matthew Wester as shipping and receiving manager, (Doc. 422-8, p. 8, tpp. 25–27); and defendant Debra Campos as manager of the cutting department, (Doc. 422-7, p. 9, tp. 30).

On April 8, 2013, Mr. Turnage, through Gemstone, completed the purchase of RCF for $500,000, $100,000 of which was in cash.  The $400,000 balance was financed.  (Doc. 422-1, p. 17, tpp. 55–57; Doc. 422-2, p. 3, ¶ 7; Doc. 422-9, p. 7, tpp. 16–17).  Before the Decatur plant could begin operating, Gemstone had to obtain a plant number from the USDA, and the company had to establish relationships with customers like Tyson Foods, Cargill, and Land of Frost and get vendor numbers

---

[7] As part of a trip on behalf of Ms. Carr to drive her Porsche to Dallas, Mr. Wester visited Dallas USA to help the company prepare to service Tyson orders.  (Doc. 422-19, pp. 25–26; Doc. 454-1, p. 14, tpp. 54–55).  As of 2021, Dallas USA was still processing chicken breasts and tenders for Tyson but at a lower volume than the height of its Tyson work in 2013.  (Doc. 422-19, pp. 20–21).

from them.  (Doc. 422-2, p. 3, ¶ 8).  Gemstone also had to find a source for chicken to process for its customers.

As planned, when the Decatur plant began operating, Tyson moved most of its orders from Dallas USA to Gemstone.  (Doc. 422-2, p. 3, ¶ 11; Doc. 422-16, pp. 21–22, tpp. 80–81).[8]  Mr. Ensley arranged for Dallas USA to be the "backup plan" for Tyson's orders when Gemstone was operating at full capacity.  (Doc. 422-2, p. 3, ¶ 11; Doc. 422-18, pp. 47–48, tpp. 184–86).

### *The Poultry Industry*

Poultry processing companies like Diamond Foods, Dallas USA, and Gemstone must acquire the chicken they process and sell to their customers.  (Doc. 322-18, p. 24, tp. 92; Doc. 525-1, p. 20, tp. 77).  To do this, processing companies turn to poultry brokers.  For several reasons, brokering is risky business.

On the supply side, brokers build relationships and form bonds with meat suppliers.  (Doc. 525-1, pp. 20–21, tpp. 80–81).  During "contract season" in the fall of each year, brokers reserve quantities of meat – "blocks" in the industry – for portioning over the coming year.[9]  The industry term "contract season" is a

---

[8] Dallas USA hired extra employees to handle the Tyson work that Mr. Ensley directed to the company.  When Tyson moved its orders to Gemstone, Dallas USA no longer could maintain the extra staff.  (Doc. 422-19, pp. 21–22).

[9] For example, during the 2012 contract season, Ms. Carr secured from Pilgrim's six loads of boneless breast meat per week.  (Doc. 525-1, p. 22, tp. 88).  Ms. Carr reserved that meat in the fall of 2012 at Tyson's request.  (Doc. 525-1, p. 23, tp. 90).

misnomer because brokers and suppliers do not use contracts. Brokers give suppliers their word that they will acquire certain quantities of meat in a year, and brokers rely on their relationships with suppliers to maintain the suppliers' confidence and dissuade suppliers from withholding chicken that they promised to a broker in the fall. (Doc. 525-1, pp. 12–13, 20–21, tpp. 45–51, 77, 79–80, 82–83).[10] Brokers wield significant power in the portioning business because they decide to which companies they will direct their meat blocks. (Doc. 525-1, pp. 19–20, tpp. 76, 78). Brokers may direct their meat to processing companies, or they may sell their meat on the spot market when the demand for meat is high. (Doc. 525-1, p. 21, tpp. 83–84).

When they source meat for a portioning company like Dallas USA or Gemstone, brokers must have a way to finance a transaction. Brokers may use their credit to secure loads of chicken for processing, or brokers may use a portioning company's credit to secure meat. Brokers "trade chicken" when they use their credit to buy chicken and resell it to a portioning company. Brokers "broker" chicken when they rely on outside credit to finance the sale of meat. (Doc. 422-18, p. 24, tpp. 90–91). A processing company typically needs to work for at least two years in

---

[10] In his deposition, Mr. Ensley testified that the poultry business is "about respect and knowledge and the people you know and do they like you. Do they trust you. . . . [I]t's not about the chick[en] – it's a people business, and you've got to have that knowledge." (Doc. 322-18, p. 26, tpp. 98–99).

the poultry industry before a supplier will extend credit to the company.  (Doc. 422-18, p. 23, tp. 88; Doc. 525-1, p. 8, tp. 32).[11]  For brokers. loads financed with a broker's credit are riskier than loads that portioning companies secure with their company's credit.

Brokers must be very familiar with customer needs to make sure they do not secure more meat for portioning than customers for portioned meat will buy over the course of a year.  Portioned meat customers like Tyson Foods will not give brokers contracts.  (Doc. 525-1, p. 10, tpp. 38–39).  If the market drops and Tyson's requirements for portioned chicken fall, then Tyson is not obligated to buy chicken to which it committed verbally.  (Doc. 525-1, p. 20, tp. 78).

Ms. Carr did not use contracts in her brokerage business; "[i]t was just kind of a, you know, I trust you, you trust me kind of thing."  (Doc. 525-1, p. 10, tpp. 39–40).  In Ms. Carr's words, chicken brokering is "like playing the slots or gambling . . . ."  (Doc. 525-1, p. 20, tp. 78).  It is a high-risk business, but it also is a highly lucrative business when a broker gambles well.  (Doc. 525-1, p. 20, tpp. 78–79).

---

[11] Securing credit directly with suppliers is crucial for a poultry portioner to survive.  (Doc. 238-2, p. 3, ¶ 9; Doc. 422-2, p. 4, ¶ 12; Doc. 422-14, p. 28, tpp. 98–99; Doc. 422-18, p. 23, tp. 88; Doc. 422-54, pp. 9, 26, tpp. 29–30, 98–99).  Otherwise, the portioner would have to pay for its supply upfront and secure a credit line with substantial interest from a bank.  (Doc. 422-2, p. 4, ¶ 12; Doc. 422-14, p. 28, tpp. 98–99).

In the poultry industry, "your word is your bond."  (Doc. 525-1, p. 11, tpp. 41–42).

### Mr. Ensley's Business Model for Gemstone

Mr. Ensley implemented a business model at Gemstone that helped the company become profitable in a short period of time.  (*See* Doc. 422-2, p. 4, ¶ 12). He tied his pricing model to the Urner Barry index, commonly called the UB.  (Doc. 422-2, p. 4, ¶ 12).  The UB tracks the daily open market price for chicken parts. (Doc. 422-1, p. 37, tp. 135).[12]   Under Mr. Ensley's system, Gemstone charged customers a certain amount above the UB rate for portioned chicken.  (Doc. 422-2, p. 4, ¶ 13; Doc. 422-26, p. 2; Doc. 422-27, p. 2).  The amount he charged Gemstone's customers above the UB rate for portioned chicken "depended on a number of factors:  the customer and the volume from that customer, the size of the fillets, the market for incoming chicken, and the market for outgoing fillets."  (Doc. 422-2, p. 4, ¶ 13).  Mr. Ensley knew Gemstone's production costs "down to the tenth of a penny," so he "always told all suppliers . . . that if they can buy *quality* raw chicken for at least $.05 below UB, [he could] make processing facilities . . . turn a significant profit."  (Doc. 422-2, p. 4, ¶ 13) (emphasis in Ensley declaration).  Gemstone usually bought meat from AAA for five cents below the UB and sold the processed meat for

---

[12] Because of several market forces, in 2013, poultry prices were very high.  (Doc. 422-18, pp. 26–27, tpp. 99–100, 102; Doc. 525-1, p. 19, tp. 75).

41 cents above the UB.  (Doc. 422-1, p. 55, tpp. 207–08; Doc. 422-18, p. 27, tp. 101; *see also* Doc. 422-52, p. 2; Doc. 422-115, p. 2; Doc. 422-116, p. 3; Doc. 525-1, pp. 37–38, tpp. 146, 151).

Gemstone's profitability also depended on the quality of the yields it could produce from raw chicken and the efficiency of its production.  Gemstone, like other poultry portioners, processed chicken into different cuts.  (*See* Doc. 422-14, pp. 23–24, tpp. 78–83).  The hierarchy of products from highest quality/sale price to lowest quality/sales price was the following:  top filet; bottom filet; tenders; nuggets; and trim.  (*See* Doc. 422-14, pp. 23–24, tpp. 78–83).  A top filet is the part of a boneless, skinless chicken breast – BSB – that usually is the most visually appealing to customers.  (*See* Doc. 422-14, p. 23, tpp. 78–81; Doc. 422-16, p. 16, tpp. 58–60).  A bottom filet is the remaining filet of a BSB that lacks a shiny membrane and thus is usually breaded and fried before being served.  (Doc. 422-14, p. 23, tp. 81).  Tenders are parts of either the bottom or top of a BSB cut into strips.  (Doc. 422-14, p. 23, tp. 81).  Nuggets are chunks of breast meat.  (Doc. 422-14, pp. 23–24, tpp. 81–82).  Trim is whatever is left of a BSB after cutting out the top, bottom, strips, and nuggets.  (*See* Doc. 422-14, p. 24, tp. 82).

Gemstone achieved maximum profits by maximizing its yield of top and bottom filets and minimizing its yield of strips, nuggets, and trim.  (Doc. 422-14, pp. 24, 27, tpp. 83, 94–95).  To that end, Gemstone's management tested each cutter's

yield daily and sent cutters whose yields were unacceptable for additional training. (Doc. 422-4, pp. 16–17, tpp. 60–61). Gemstone also tracked the average sales price of the total yield from raw supply to determine whether a particular contract with a buyer would be profitable. (Doc. 422-14, pp. 26–27, tpp. 93–94). Mike Ensley managed the product mix at Gemstone. (Doc. 422-4, p. 17, tp. 62).

During its first year of operations, RCF cut mostly BSB filets. Mr. Ensley testified that his business model generated $4 million in profit for Gemstone during that year. (Doc. 422-2, p. 4, ¶ 14). Gemstone used those profits to buy a second processing plant in Decatur in April of 2014. (Doc. 422-2, p. 4, ¶ 15).[13]

### *Ms. Carr and AAA's Business Arrangement with Gemstone*

Ms. Carr operates as a broker in the poultry industry through her company AAA. (Doc. 238-2, p. 3, ¶ 3; Doc. 525-1, p. 8, tp. 29). Ms. Carr "secur[es] meat for processing facilities and then, in some instances, help[s] the processing facility sell the finished cutlets to a purchaser." (Doc. 238-2, p. 3, ¶ 3). To cement her relationship with suppliers, Ms. Carr worked very hard to sell their meat in years when market demand was low. (Doc. 525-1, pp. 20–21, tpp. 80–81). Ms. Carr and Mr. Ensley began working with one another in 2009 and started a romantic

---

[13] Across the board, 2013 was an excellent year for poultry portioning companies. (Doc. 525-1, p. 10, tp. 37). Companies had been using equipment rather than manpower to portion chicken, and "the yields were terrible." (Doc. 525-1, p. 10, tp. 37; *see also* Doc. 422-4, p. 16, tpp. 57–58). Companies turned to hand-portioning to increase yield. (Doc. 525-1, p. 10, tp. 37).

relationship in the fall of 2012.  (Doc. 422-18, pp. 4, 24, tpp. 12, 89; Doc. 525-1, p. 25, tp. 97).

Mr. Ensley introduced Ms. Carr to Mr. Turnage and recommended that Gemstone use Ms. Carr to source chicken.  (Doc. 422-1, pp. 33, 39, tpp. 121, 144; Doc. 422-18, pp. 24, 27, tpp. 90, 104).  Mr. Ensley did not inform Mr. Turnage that he and Ms. Carr were in a romantic relationship.  (Doc. 263-1, pp. 5–6, ¶ 7; Doc. 422-1, pp. 56–57, tpp. 213, 216).  Mr. Ensley and Mr. Turnage met with Ms. Carr and asked her to "source meat, keep the plant full of meat . . . ."  (Doc. 525-1, p. 21, tp. 84; *see also* Doc. 422-1, pp. 33–34, tpp. 121–22).  Ms. Carr was willing to use meat that she had secured during the 2012 fall contract season to fill RCF's processing plant with chicken because she trusted Mr. Ensley, and she wanted to see him succeed at Gemstone.  (Doc. 422-18, p. 23, tp. 88; Doc. 525-1, pp. 21–22, tpp. 84–86).

AAA started sourcing meat for Gemstone in April 2013.  (Doc. 238-2, p. 3, ¶ 5).  Because Gemstone was a new portioner that had not yet established credit with suppliers, Mr. Ensley and Ms. Carr agreed that AAA would use its credit with suppliers to buy meat and deliver the meat to Gemstone for processing.  (Doc. 238-2, pp. 4–5, ¶ 9; Doc. 422-2, p. 4, ¶ 12).[14]  According to Ms. Carr, because Gemstone

---

[14] In her deposition, Ms. Carr testified that she had not planned to use her credit when she sourced chicken for Gemstone, but Mr. Turnage could not get financing, and Mr. Ensley assured her that

was "a new processing facility" without its own sales force, Gemstone "needed AAA's contacts in the poultry industry to secure meat to process, manage transport of the meat, and locate purchasers for the finished cutlets." (Doc. 238-2, p. 3, ¶¶ 7–8; *see also* Doc. 238-2, p. 3, ¶ 9; Doc. 525-1, p. 24, tp. 94 ("I was doing everything, s[ales], purchasing, accounting, transportation."); Doc. 525-1, p. 31, tp. 122 ("My job was to source meat, keep the plant full of good quality meat, don't run them out, help with the transportation of that meat, help find staff for the plant and fill them up with sales volume, which was [] those customers that you had asked me about . . . .")). Ms. Carr brought her customers for portioned meat to Gemstone when the company began operating. (Doc. 322-18, p. 25, tp. 96; Doc. 525-1, p. 24, tp. 93).

To furnish Gemstone's requirements for meat to portion, Ms. Carr bought chicken from suppliers, sold the chicken to Gemstone, "provided Gemstone with a purchase order for each sale clearly denoting the amount charged per pound," and "Gemstone paid all of the purchase orders submitted by AAA without complaint." (Doc. 238-2, p. 5, ¶¶ 18–19).

Gemstone did not pay AAA for the meat it bought until the finished cutlets were sold to a purchaser. (Doc. 238-2, p. 4, ¶ 10). Under this arrangement,

---

he was an owner of the company, so, because she trusted Mr. Ensley, Ms. Carr began using her credit to source chicken for Gemstone. (Doc. 525-1, p. 31, tp. 124).

according to Ms. Carr, Gemstone may have owed AAA anywhere from $6 million to $12 million on any given day.  (Doc. 238-2, p. 4, ¶ 11; *see also* Doc. 525-1, p. 34, tp. 135).  Ms. Carr testified that Gemstone agreed to pay her "a penny a pound" for her work bringing chicken to Gemstone for portioning.  (Doc. 525-1, p. 24, tpp. 94–95).  Gemstone billed customers for the portioned chicken directly, so Ms. Carr did not make money on the sales side of her work for Gemstone.  (Doc. 525-1, pp. 31, 35, tpp. 123, 137).[15]  Until December 29, 2014, Gemstone paid all of AAA's invoices.  (Doc. 525-1, pp. 32, 34, tpp. 127, 136).

Mr. Turnage calls this arrangement with Ms. Carr a "cost-plus" agreement.  (*E.g.*, Doc. 422-1, p. 33, tpp. 119–20).  According to Mr. Turnage, the cost-plus agreement was Mr. Ensley's idea:  "[Mr. Ensley] said, I think we can get her to do this, and we'll pay her a penny a pound to buy the meat. And so I thought about it,

---

[15] Three email messages from the first year or so of Gemstone's operations confirm this payment arrangement.  First, on July 17, 2013, Ms. Carr sent herself an email that stated:  "I will buy the meat from mt aire.  [I] sell gemstone and gemstone invoice overhill direct.  Gemstone pays me a penny brokerage."  (Doc. 525-10, p. 1).  Second, in a November 22, 2013 email, Ms. Carr wrote to Mr. Turnage:  "I make .01-.02 on Gemstone and more on others I sell too [sic] because of the volume Gemstone buys and they pay me faster than some of the others."  (Doc. 422-64, p. 2).  Mr. Turnage referred to this email as confirmation of the cost-plus agreement at his deposition.  (Doc. 422-1, pp. 33, 38, 40, 59, tpp. 120, 138, 146–47, 222–23).  In the email message Ms. Carr responded to several questions from Mr. Turnage, two of which were:  "When you sell Gemstone it's [sic] product, how much markup and/or profit do you put on each load[?]"; and "Is the markup based on per lb or per load[?]"  (Doc. 422-64, p. 6).  Mr. Turnage testified that he already knew the answers to those questions:  she charged a penny per pound.  (Doc. 422-1, p. 38, tpp. 140–41).  He mentioned "per load" in the email only to "make sure it was on a per pound basis"; he never thought that Ms. Carr actually made only one cent on a load of thousands of pounds of chicken.  (Doc. 422-1, pp. 38–39, tpp. 141–43).  Finally, in a June 20, 2014 email, Mr. Ensley explained to Mr. Turnage that he had paid Ms. Carr "just for buying [chicken] and not included trucking, customers or profits to the equation."  (Doc. 422-66, p. 3).

and I said, okay, that's fine." (Doc. 422-1, p. 33, tp. 121; *see also* Doc. 422-1, p. 47, tpp. 174–75). Mr. Turnage testified that, per the agreement, Gemstone paid Ms. Carr a fee of one cent per pound of meat that Gemstone purchased from AAA at cost. (Doc. 422-1, p. 33, tp. 120). In other words, Gemstone paid AAA's "cost" for each pound of meat "plus" one cent per pound as Ms. Carr's fee. For "one-off" or "unusual" orders "kind of out of the day-to-day arena," Gemstone would pay Ms. Carr two cents instead of one cent. (Doc. 422-1, p. 33, tp. 120).[16]

Mr. Turnage testified that Mr. Ensley and Ms. Carr assured him that they did not need a written contract to support AAA's work for Gemstone. (Doc. 422-1, p. 34, tpp. 122–23). Mr. Turnage asked Ms. Carr if she wanted to send him a contract or if he should send her a contract, but she said: "[W]e don't use contracts in the poultry business . . . ." (Doc. 422-1, p. 34, tp. 122). Instead, "[y]our word is your bond. It's a handshake deal." (Doc. 422-1, p. 34, tp. 123). Ms. Carr told Mr. Turnage that that system works in the poultry industry because "people who don't do what they say . . . don't stay in this business very long. And so the people who are in the business, they're honest and do what they say they're going to do . . . ." (Doc. 422-1, p. 34, tp. 123). Mr. Turnage found this strange, but he testified that he

---

[16] Mr. Turnage described the cost-plus agreement the same way in his first summary judgment response declaration: "Carr/AAA secured poultry products from suppliers at the best price possible and charged Gemstone on a 'cost plus' basis for her brokerage services with Gemstone paying Carr/AAA $0.01 per pound above actual cost for large volume sales and $0.02 per pound above actual cost for one-off, small-volume loads . . . ." (Doc. 263-1, p. 3, ¶ 4).

obliged because Mr. Ensley said the same things:  "[O]h, no, you don't use a contract.  That's how everybody does it."  (Doc. 422-1, p. 34, tp. 123).  Mr. Turnage testified that Ms. Carr "used the term your word is your bond, but [Mr. Ensley] basically said the same thing."  (Doc. 422-1, p. 34, tp. 123).

Mr. Turnage trusted Mr. Ensley as president of Gemstone to ensure that the company was paying Ms. Carr according to the cost-plus agreement.  (Doc. 422-1, pp. 34–35, tpp. 125–26; *see also* Doc. 422-1, p. 39, tpp. 143–44 ("[I] trusted [Ms. Carr], trusted Mr. Ensley.  They were honest people.  That's all I heard, how honest they were, that I had no reason to doubt them. . . .  I hired [Mr. Ensley] to run the company.  If I thought that he was not an honest man, he wouldn't have been running the company.")).  Mr. Turnage testified that his accounting group did not keep up with Ms. Carr's fees because he trusted Mr. Ensley to do so because Mr. Ensley had "common day-to-day phone calls" with Ms. Carr, "they were constantly talking back and forth," they had assured Mr. Turnage that "your word is your bond" and "we're honest as the day is long," and Mr. Ensley told Mr. Turnage that Ms. Carr "is the best there is, [Ms. Carr] is phenomenal.  All these people trust, trust, trust, you can trust us, and it was not an issue."  (Doc. 422-1, pp. 34–35, tpp. 122–26).  So, "it was up to her to be honest in her billing and add the penny a pound."  (Doc. 422-1, p. 35, tp. 126; *see also* Doc. 422-1, p. 60, tpp. 226-27).

Ms. Carr testified that she would evaluate her billing rate for Gemstone week to week. (Doc. 525-1, p. 39, tp. 154). She would always bill Gemstone on BSB at UB minus five, and she might set her fee better than minus five based on different factors. Her billing rate might vary based on her risk (meaning how much money Gemstone owed AAA) and the time she invested in locating transportation. In addition, she might add a few pennies to her price if she could have sold the BSB elsewhere for more money. (Doc. 525-1, p. 39, tpp. 154–55). AAA paid all freight bills; Ms. Carr did not bill Gemstone for transportation costs. (Doc. 525-1, p. 39, tp. 156).

### Ms. Carr's Work for Gemstone Changes

In time, the arrangement between Ms. Carr and Gemstone changed.[17] After several months, Ms. Carr "was looking for some relief from the stress and risk" of the arrangement. (Doc. 238-2, p. 5, ¶ 20). Mr. Turnage supported Ms. Carr; he wanted to "figure out a way to allow [Ms. Carr] to accomplish what [she] want[ed]" while keeping AAA "under [Gemstone's] umbrella." (Doc. 422-64, p. 5). That solution, in Ms. Carr's words, was to "transition to a broker role . . . ." (Doc. 238-

---

[17] In her deposition, Ms. Carr indicated that, from the beginning, she, Mr. Ensley, and Mr. Turnage had planned that, if she would "help them get off the ground and get going," she "could do their buying and be like a broker, not a trader, to where [she] didn't have all the liability . . . So [her] agreement was [she] helped them get off the ground and get going and then [she] could do their purchasing . . . [and] be paid a penny a pound on the purchasing and two cents a pound on sales. They would do the money, they would have the accounting staff, they would have all the liability and the cash and all that problem, not [her]." (Doc. 525-1, p. 24, tpp. 93–95).

2, p. 5, ¶ 20; *see also* Doc. 525-1, p. 40, tp. 157).  She wanted to "arrange Gemstone's purchase of meat and sale of finished cutlets" and arrange for Gemstone to pay suppliers directly.  (Doc. 238-2, p. 5, ¶ 20; Doc. 525-1, p. 40, tp. 157).  Gemstone would "handle shipping, logistics, and invoicing; and assume the risk previously borne by AAA."  (Doc. 238-2, p. 5, ¶ 20).  Ms. Carr arranged for Gemstone to have direct credit with Keystone, Mountaire, Wayne Farms, and, probably, Pilgrim's Pride.  (Doc. 525-1, p. 40, tp. 157).

Because AAA would no longer bear the risk of using its credit or paying for transportation, Ms. Carr and Mr. Ensley reached a new payment agreement.  (Doc. 238-2, p. 6, ¶ 21).  They agreed that Gemstone would pay AAA $0.005 (half of one cent) per pound of meat that Gemstone purchased and pay AAA $0.02 per pound of finished cutlets that Gemstone sold through deals brokered by Ms. Carr.  (Doc. 238-2, p. 6, ¶ 21; *see also* Doc. 422-66, p. 3; Doc. 422-67, p. 3; Doc. 422-68, p. 2).  The new brokerage agreement went into effect in November 2014.  (Doc. 238-2, p. 6, ¶ 22).  Under the new agreement, Ms. Carr brokered several deals between Gemstone and suppliers and customers in November and December 2014.  (*See* Doc. 422-65; Doc. 422-69).

### The Turnage/Gemstone-Ensley-Carr/AAA Relationship Unravels

Not long after Ms. Carr arranged for Gemstone to have direct credit with her suppliers, Mr. Turnage became concerned that Ms. Carr and Mr. Ensley may be

colluding with one another against Gemstone.  Near the end of 2014, "there was a whole lot of things that had happened that raised significant questions in [Mr. Turnage's] mind" regarding Ms. Carr and Mr. Ensley.  (Doc. 422-1, p. 57, tp. 216). Mr. Turnage believed these things were related.

Mr. Turnage first became suspicious in November of 2014 when $1.3 million of "newly found invoices that were owed to AAA . . . just appeared out of nowhere and were paid basically on sight."  (Doc. 422-1, p. 30, tp. 106; *see also* Doc. 422-1, p. 32, tp. 116; Doc. 525-1, p. 32, tpp. 127–28).  Gemstone's CFO, Michael Harwell, paid the invoices at Mr. Ensley's direction.  (Doc. 422-1, pp. 30–31, tpp. 109–11; *see also* Doc. 525-1, p. 32, tpp. 127–28).  But the company's accounting showed that the $1.3 million applied to loads of chicken that AAA sourced before November 2014, "maybe as far back as 12 weeks, 14 weeks."  (Doc. 422-1, p. 30, tp. 107).[18] "Because Ms. Carr was adamant that she got paid every seven days, and she was very diligent in getting her invoices submitted," the November 2014 invoices applicable to past purchases seemed out of character to Mr. Turnage.  (Doc. 422-1, p. 30, tp. 107).[19]

---

[18] Ms. Carr acknowledges that the group of 2014 invoices were delayed, but she attributes the delay to her busy fall season when she was trying to secure blocks of meat for 2015.  (Doc. 525-1, p. 32, tpp. 127–28).  Mr. Turnage acknowledges that when Ms. Carr was working in December of 2014, Ms. Carr was looking for chicken for Gemstone to process in 2015.  (Doc. 422-1, p. 57, tp. 214).

[19] In his deposition, Mr. Turnage pointed to the fact that Mr. Wester had been making fraudulent RCF bills of lading "and things of that nature," so the batch of late AAA invoices was suspect.

The unusual batch of invoices coincided with "a point in time when Mr. Ensley ha[d] already been thinking about doing something else"—*i.e.*, leaving Gemstone.  (Doc. 422-1, p. 30, tp. 107).  Mr. Turnage realized that, if Gemstone had not paid AAA invoices for several months, then Mr. Ensley's bonuses for months in which the invoices should have been paid were inflated because, as mentioned, those bonuses were 10% of Gemstone's monthly after-tax profit.  (Doc. 422-1, pp. 29, 41, tpp. 103, 152–53).  Mr. Turnage explained:

> [S]o when you look at the accounting for that, that 1.3 million was applicable to prior periods, so from October 30th back.
>
> And so when you allocate that cost into those prior periods, it reduces that profit. And when you look at the profit calculation for purposes of his bonus, the profit amounts that he presented were overstated by $1.3 million, so he had been overpaid his bonus based on the overstatement of profits.

(Doc. 422-1, p. 30, tp. 106).

And, around this time, Mr. Turnage learned that Ms. Carr and Mr. Ensley were romantically involved and living together.  (Doc. 422-1, pp. 56–57, tpp. 213, 216). Mr. Turnage considered it "a pretty big red flag" when "you have your largest vendor living with the president of the company who is responsible for ensuring that the vendor is properly billing the company and the company is getting what it bargained for."  (Doc. 422-1, p. 59, tpp. 223–25).

---

(Doc. 422, p. 30, tp. 108).  The topic of the undisputed fraudulent RCF bills of lading is explored below.

Mr. Turnage decided to investigate.  On December 29, 2014, he sent an email to Ms. Carr expressing concerns about the relationship between Gemstone and AAA. (Doc. 422-72).  The email stated:  "Gemstone has begun a detailed investigation of its historical operational and financial commitments, cash flows, payments, invoices, etc[.] to customers, employees, vendors, suppliers, etc. . . . I am concerned that based on what is known thus far, there may very well be some substantial issues and discrepancies concerning the relationship between you/AAA and Gemstone . . . ." (Doc. 422-72, p. 2).  He asked that Ms. Carr "immediately cease any representation of and/or for the benefit of[] Gemstone . . . ." (Doc. 422-72, p. 2).  He delegated Ms. Carr's tasks to a different person and stated:  "I trust you will be supportive of Gemstone[']s operation and not interfere nor disparage the company especially with customers and suppliers that you deal with of which Gemstone deals with as well." (Doc. 422-72, p. 2).  He would "honor the commission agreement with [her]" only if "Gemstone['s] audit/investigation determine[d] that all dealings, invoicing, pricing[,] etc[.] between AAA and Gemstone [were] in accordance with [their] agreement." (Doc. 422-72, p. 2).  Ms. Carr contends that Gemstone stopped paying her invoices on December 29, 2014 for deals she brokered under the $0.005/$0.02 brokerage agreement.  (Doc. 525-1, p. 32, tp. 127).

After investigating, Mr. Turnage found additional discrepancies.   The plaintiffs believe that Ms. Carr routinely inflated her invoices, which she submitted

and Mr. Ensley directed to be approved, above the penny-per-pound agreement. The record contains a 52-page spreadsheet titled "Calculation of AAA Overcharge to Gemstone" apparently prepared by "Lumen Forensics & Economics." (Doc. 397). The plaintiffs attached the document to their third amended complaint and incorporated it into the summary judgment record. (Doc. 526, p. 6). Each row in the spreadsheet corresponds to meat AAA sourced from a supplier throughout 2013 and 2014. The spreadsheet identifies the date of purchase, purchase order/item number, Bates numbers, the name of AAA's vendor, the weight ordered by AAA, the "actual weight referenced," AAA's price, Gemstone's price, the variance between those two prices, AAA's cost, AAA's "cost plus $0.01," Gemstone's cost, and the difference between AAA's cost plus $0.01 and Gemstone's cost, "represent[ing] overcharge to Gemstone." (Doc. 397). The spreadsheet calculates a total overcharge to Gemstone of $974,489.88 in 2013 and $3,447,115.37 in 2014. (Doc. 397, pp. 14, 52). The plaintiffs contend that the spreadsheet shows the invoices that Ms. Carr submitted to Gemstone that exceeded AAA's cost plus $0.01. (Doc. 391, pp. 42, 51, ¶¶ 5.6, 5.23; Doc. 526, p. 6). The defendants do not dispute the spreadsheet. Instead, the defendants assert that the prices on each invoice in the spreadsheet should be binding against Gemstone under the Uniform Commercial Code. (Doc. 414, p. 44).

Meanwhile, Mr. Turnage and Mr. Ensley had been discussing the possibility that Mr. Ensley might retire from full-time work. (Doc. 422-2, p. 4, ¶ 16). Mr. Turnage presented to Mr. Ensley a potential retirement agreement according to which Mr. Ensley would continue serving as president of Gemstone until December 1, 2014, work only on an as-needed basis thereafter, and finally retire on December 31, 2014. (Doc. 422-2, p. 4, ¶ 16; Doc. 422-74, p. 2). Mr. Ensley disapproved of several "severe and aggressive restrictive covenants" in the proposal that he alleged would effectively prevent him from working in the poultry industry ever again and subject him to undeserved personal liability. (Doc. 422-2, pp. 4–5, ¶ 16). And he thought that Mr. Turnage could unduly manipulate the retirement payments. (Doc. 422-2, p. 5, ¶ 16). So Mr. Ensley rejected the offer. (Doc. 422-2, p. 5, ¶ 16).

Mr. Ensley testified that Mr. Turnage then refused to negotiate further. (Doc. 422-2, p. 5, ¶ 16). According to Mr. Ensley, Mr. Turnage terminated Gemstone's relationship with him on November 30, 2014, did not pay him his final two weeks of salary and accrued bonuses for October and November 2014, and reneged on a previous agreement to fund an executive savings plan for him. (Doc. 422-2, p. 5, ¶ 16). These allegations are the basis for Mr. Ensley and A&M's claims against the plaintiffs in case 15-1179. (*See* 5:15-cv-1179, Doc. 1).

Mr. Turnage remembers Mr. Ensley's departure differently. Mr. Turnage testified that he paid Mr. Ensley's salary in full through November 30, 2014, the day

Mr. Ensley retired.  (Doc. 422-1, pp. 29, 44–45, 61, tpp. 104, 165–66, 231–32).  Mr. Turnage testified that Mr. Ensley might have been paid his bonus for October 2014, but he was not paid a bonus for November 2014 because, according to Mr. Turnage, newly discovered and suspect invoices showed that Mr. Ensley had overstated profits by $1.3 million and therefore had received overpayments in monthly bonuses.  (Doc. 422-1, pp. 29–30, tpp. 105–06).  And Mr. Turnage testified that he never reached a final agreement with Mr. Ensley to fund an executive savings plan.  (Doc. 422-1, p. 43, tpp. 158–161).

### *Cross-docking, Shipment Inspections, and Fictitious RCF Bills of Lading – Mr. Pass, Mr. Welborn, and Mr. Wester – and Sometimes Eddie Hill – Operate a Side Business on Gemstone's Watch*

Most of Gemstone's work concerned the sale of portioned chicken, but Gemstone also provided cross-docking services to its customers.  Cross-docking involves the repackaging of chicken in trucks that are transporting chicken products across state lines.  (Doc. 422-4, p. 29, tp. 111; *see also* Doc. 422-3, p. 11, tp. 40 (describing "cross-docking" as "you bring chicken in, you unload it, you inspect it, maybe.  I'm not sure.  Label it, put it on another truck, and ship it out.")).[20]  Before Gemstone opened its second plant, its dock had only one door, and trucks had to

---

[20] In his first deposition, Mr. Wester testified that cross-docking means "when you have a truck that's got to go to the other side of the country and you only have one driver, it gets dropped off and another driver picks it up and finishes carrying across to its destination."  (Doc. 454-1, p. 38, tp. 150).

wait in line to use the docking area. Some trucks were waiting many hours to access the dock. (Doc. 422-4, p. 29, tp. 109; *see also* Doc. 454-3, p. 29, tpp. 114–15). This slowed trucks that were making scheduled deliveries of chicken products.

Brad Lenoir used Gemstone's cross-docking services. (Doc. 422-4, p. 29, tp. 111). Mr. Ensley, Mr. Welborn, Mr. Pass, Mr. Wester, and Mr. Lenoir had worked together at Diamond Foods. When Mr. Ensley left Diamond Foods and brought Mssrs. Welborn, Pass, and Wester to Gemstone, Mr. Lenoir opened a brokerage firm called Canebrake. (Doc. 422-4, p. 10, tpp. 33–34; Doc. 454-1, p. 38, tp. 149). As Gemstone's business grew, Mr. Lenoir began complaining about the delays at the dock, and he asked Gemstone to drop its price for cross-docking from 15 cents per pound to between 10 and 12 cents per pound. Mr. Ensley refused to reduce Gemstone's price. (Doc. 422-4, pp. 29, 31, tpp. 110, 118–19; *see also* Doc. 454-3, p. 29, tp. 115).

Mr. Welborn saw an opportunity, so he asked Mr. Lenoir if he would send the business to him if he found a location. Mr. Lenoir told Mr. Welborn to move quickly. So, in August of 2013, Mr. Welborn talked to Mr. Pass, and Mr. Pass spoke to Mr. Wester about forming an LLC and conducting cross-docking business under the name PWW. (Doc. 422-4, pp. 31–32, tpp. 119–21). None of them had the means to rent a warehouse, so Mr. Welborn reached out to his friend Eddie Hill. (Doc. 422-4, pp. 29, 31, 32, tpp. 110, 119, 122; Doc. 454-3, p. 38, tp. 150).

Eddie Hill was Gemstone's controller from June 2013 to January 2014. (Doc. 422-3, pp. 6–7, tpp. 18, 23).[21] Eddie Hill rented a location for Mr. Welborn to begin cross-docking for Mr. Lenoir, and Eddie Hill operated the cross-docking business through his company named Galleria. (Doc. 422-4, pp. 29, 31, tpp. 112, 117–18; Doc. 454-3, pp. 38–39, tpp. 150, 152, 155). Galleria's only cross-docking customer was Mr. Lenoir's company, Canebrake. (Doc. 422-4, p. 31, tpp. 117–18).[22] Galleria began assisting Mr. Lenoir in January of 2014 and continued through August of 2014. (Doc. 422-4, pp. 31–32, tpp. 120, 123; Doc. 454-17, p. 1). Eddie Hill invoiced Canebrake for the work that Galleria performed for Mr. Lenoir. (Doc. 454-5, p. 7, tpp. 26–27). Mr. Welborn, Mr. Pass, and Mr. Wester shared in the profits from Galleria's operations. (Doc. 422-4, p. 33, tp. 128; Doc. 454-3, p. 39, tpp. 154–55; Doc. 454-5, p. 7, tp. 25). Mr. Welborn, Mr. Wester, and Mr. Pass used their income from Galleria to supplement their income from Gemstone. (Doc. 422-4, p. 34, tpp. 129–30).

In September of 2014, PWW, LLC took over where Galleria left off. (Doc. 422-4, p. 34, tp. 130; Doc. 454-3, p. 38, tp. 149). As it turns out, most of Galleria's

---

[21] Eddie Hill provided services to Gemstone as an independent contractor through his firm Cooper Hill & LeCroix. (Doc. 422-1, p. 61, tpp. 232–33). Gemstone terminated its relationship with Eddie Hill in January 2014 and replaced him with Mr. Harwell. (Doc. 422-1, p. 52, tp. 197). Mr. Welborn testified that Mr. Ensley fired Eddie Hill. (Doc. 422-4, p. 32, tp. 123).

[22] In 2014, Galleria did some work for a company called Freedom. (Doc. 454-17, p. 1). The Court has not identified the nature of the work that Galleria performed for Freedom.

work for Canebrake involved inspections of the packaging of chicken products in trucks to "mak[e] sure that . . . there was no chance of failure, that the combos wouldn't spill" in transit.  (Doc. 454-3, pp. 23–24, tpp. 92–94).  Galleria rarely performed cross-docking.  (Doc. 454-17, p. 1).  Consequently, Mr. Wester and Mr. Pass did not need a facility to do Mr. Lenoir's work.  (Doc. 422-4, p. 34, tp. 130). When PWW performed Mr. Lenoir's work, Mr. Wester or Mr. Pass would meet a truck at a truck stop to perform an inspection.  (Doc. 422-4, p. 31, tpp. 119–20; Doc. 454-3, pp. 23–24, 38, tpp. 92, 94, 151).  The inspections typically lasted two to three minutes.  (Doc. 454-5, pp. 9–10, tpp. 36–37).[23]  PWW did not maintain books to track its work; Mr. Lenoir paid cash for PWW's services.  (Doc. 422-4, p. 34, tp. 131; Doc. 454-3, p. 24, tp. 94).[24]  This income, like the income from Galleria, supplemented the income that Mr. Wester, Mr. Welborn, and Mr. Pass were earning from Gemstone.  (Doc. 422-4, p. 34, tpp. 131–32).[25]

---

[23] Mr. Pass testified that if there was a problem with a load that PWW inspected, and the load would have to be repackaged, PWW would send the load to RCF, and RCF or Gemstone would bill Canebrake for the repackaging.  (Doc. 454-3, p. 39, tp. 153).

[24] Mr. Welborn, Mr. Wester and Mr. Pass went to a Wells Fargo bank in Decatur, Alabama to open an account for PWW, LLC.  The bank may still have records of deposits and withdrawals from the PWW account.  (Doc. 454-3, p. 30, tpp. 117–18).

[25] PWW performed work for Mr. Lenoir until Mr. Welborn, Mr. Wester, and Mr. Pass left Gemstone and formed Farm Fresh.  Mr. Lenoir's inspection business then returned to Galleria. (Doc. 422-4, pp. 34–35, tpp. 132–33; Doc. 454-5, p. 8, tp. 29; Doc. 454-17, pp. 12–14). Accounting documents for Galleria suggest that Galleria made $132,909.10 on approximately 27 orders for Mr. Lenoir/Canebrake in 2014, and Galleria made substantially more for more orders in 2015.  (Doc. 454-17, pp. 1, 12–14).

PWW invoices from October of 2014 indicate that PWW charged Canebrake $0.10 per pound for these two-to-three-minute inspection services. (*See*, *e.g.*, Doc. 454-6, pp. 2–3; Doc. 454-3, p. 28, tp. 111).[26]  Mr. Wester created bills of lading to accompany the invoices that Galleria and PWW sent to Mr. Lenoir. (*See*, *e.g.*, Doc. 419-3, p. 10; Doc. 454-5, p. 7, tp. 27; *see also* Doc. 454-11 (May 22, 2014 email from Mr. Wester to Mr. Pass with instructions for completing an RCF bill of lading for a Galleria shipment for Food Pros, a name that appears on bills of lading for work that Galleria and PWW performed for Mr. Lenoir)).[27]  The bills of lading fraudulently represented that the shipment was coming from RCF at its Holly Street plant, (Doc. 419-3, p. 10; *see also* Doc. 454-27, pp. 8–9, tpp. 32–33), but PWW did not inspect loads at RCF's dock, (*see* Doc. 454-3, pp. 36–37, tpp. 142–47 (acknowledging that RCF bills of lading for loads that PWW inspected were "a

---

[26] The PWW invoices are directed to "Brad Lenoir Brake Bush" rather than Canebrake. (Doc. 454-6, pp. 2–3).  Mr. Wester thought Mr. Lenoir's company was named Brake Bush. (Doc. 454-1, p. 38, tp. 149).

[27] In the May 22, 2014 email, Mr. Wester wrote from his personal Hotmail account: "Fill in the yellow then change back to white before printing.  I already have the bol #, po # filled in.  Call if you need anything." (Doc. 454-11, p. 1).  The email has the subject line "FP BOL." (Doc. 454-11, p. 1).  The file "RCF MASTER BOL.xls" is attached to the email. (Doc. 454-11, p. 2).  RCF MASTER BOL.xls is a RCF bill of lading template for "1050 MATURE BONELESS BREAST" that identifies RCF as the shipper, displays the name "FOOD PROS" at the top of the document, and has several blanks highlighted in yellow. (Doc. 454-11, p. 2).  Mr. Pass, using his personal Gmail account, forwarded the email to Shannon Gilchrist, who, using his Gemstone email account, responded:  "Gone as of 6:45pm bills are behind Matthews [sic] computer." (Doc. 454-12, pp. 1– 2; *see also* Doc. 454-15, pp. 1–2 (signed RCF/Food Pros bill of lading for "MATURE BONELESS SKINLESS THIGH" using the BOL template)).

fiction as to RCF")).[28]   Mr. Wester signed the fraudulent bills of lading or had someone sign his name on the fraudulent bills of lading.  (*Compare* Doc. 419-3, p. 10, *with* Doc. 419-3, p. 12).  He shared the fraudulent bills of lading with Mr. Pass and Mr. Lenoir by email from his personal Hotmail address.  (Doc. 454-1, p. 37, tpp. 147–48; Doc. 454-5, p. 10, tp. 39; Doc. 454-7).

Two email exchanges in 2014 indicate that part of the work that Galleria and PWW were doing for Canebrake concerned labeling of packaged chicken.[29]  The first is an email exchange between Mr. Wester and Mr. Lenoir dated May 30, 2014, a date during the months in which while Galleria first provided inspection services for Canebrake.  During the afternoon of May 30, 2014, Mr. Wester sent Mr. Lenoir an email with subject line "Labels" that stated:  "They had already taken the trash out after I got your message.  But I was able to save 3.  Ask them if they want 10 from every load so I don't have to dig through trash."  (Doc. 454-16, p. 1).  Later that night, Mr. Lenoir responded with a forward from "SPRAY821@aol.com":  "yes sir 10 from each load would be great thank you."  (Doc. 454-16, p. 1).  The second email regarding labeling has the subject line "Frick Frack" and is dated September

---

[28] Mr. Pass testified that "PWW would not have been inspecting a load of chicken off the docks of RCF.  It's my understanding that Matthew [Wester] created a . . . bill of lading to go with the invoice as backup documentation.  So if it was billed from PWW, it did not go to the doc[k]s on RCF."  (Doc. 454-3, p. 36, tp. 142).  RFC bills of lading created by PWW and Galleria did not relate to chicken that actually went through RCF or came from RCF.  (Doc. 454-3, pp. 36-37, tpp. 142, 146).

[29] Portioned chicken is packaged on pallets for shipping.  (Doc. 454-3, pp. 24, 37, tpp. 93–94, 145).

20, 2014; it was on PWW's watch.  Mr. Wester emailed Shannon Gilchrist, a Gemstone employee, at 6:50 a.m.: "Just fill in the yellow.  I will see if Shane [Pass] is going to be there today to get the labels.  If not call and I will talk you through making labels."  (Doc. 454-14).  That email does not have an attachment.  Mr. Gilchrist responded at 7:08 a.m.: "He is here now at plant 2."  (Doc. 454-14).  Mr. Wester used his Hotmail account to communicate with Mr. Gilchrist, and Mr. Gilchrist used his Yahoo account to email Mr. Wester, even though he was at RCF's plant when he sent the message.  (Doc. 454-14).

Labels became an issue for RCF when one of Mr. Lenoir's shipments was rejected at the Canadian border.  On March 12, 2014, Border City Storage Ltd., a company based in Ontario, Canada, applied to the USDA – the United States Department of Agriculture – to return a load of frozen chicken to the United States. (Doc. 454-24).  The application states that Border City Storage wanted to return to the United States products labeled "Unstamped Mature Boneless Chicken Breast" and "Unstamped Mature Chicken Parts Mature Boneless" because the Canadian Food Inspection Agency – the CFIA – refused the products.  The CFIA determined that the "[s]hipping label does not match description on meat cert and harmful extraneous material found on meat."  (Doc. 454-24, p. 5; *see* Doc. 454-24, p. 6, line

9; Doc. 454-24, pp. 7–8).[30]   The "COMMENTS/REMARKS" section of the application provides:  "LOAD WILL PROCEED BACK TO Est# P1174 RFC for inspection.  (If Required)."  (Doc. 454-24, p. 5).  "RFC" is a typo for "RCF" because USDA stated that Border City Storage requested the products be returned to "North Decatur, AL."  (Doc. 454-24, p. 1).  The USDA in Washington, D.C. tracked the load of frozen chicken to RCF's establishment number P-1174 and sent the application to the USDA's District Manager for Jackson, Mississippi.  (Doc. 454-24, p. 11).  The USDA District Manager forwarded the application to a Frontline Supervisor at the Food Safety and Inspection Service, noting that the applicant wished to return the shipment to RCF for "reinspection."  (Doc. 454-24, p. 1).  The Supervisor forwarded the email to Mr. Pass shortly after she received it.  (Doc. 454-24, p. 1).[31]

---

[30] Documentation relating to the CFIA inspection indicates that the extraneous material was cardboard and chips of wood, and the material was labeled a "critical defect."  (Doc. 454-24, p. 6, line 9; Doc. 454-24, p. 8).

[31] Mr. Wester eventually testified that this shipment was one of the shipments for Mr. Lenoir supported by an RCF bill of lading that did not actually involve RCF.  (Doc. 454-5, p. 9, tpp. 33–35).  Farm Fresh produced the records of the return shipment, not Gemstone or RCF.

Mr. Welborn testified that Farm Fresh got in trouble with the USDA in 2017 because of work for Mr. Lenoir.  (Doc. 422-4, p. 63, tp. 245).  Mr. Welborn testified that Farm Fresh stopped cross-docking for Mr. Lenoir in 2017 "[b]ecause [Farm Fresh] got a return load back in 2017-- or not a return load.  [Farm Fresh] got a letter in 2017, and they -- USDA come in and done an investigation.  And they said this product is going to Canada, and that is illegal. . . .  And [Farm Fresh needs] to cease and desist doing this business.  So [Farm Fresh] did."  (Doc. 422-4, p. 63, tp. 245).

Labels were mentioned to Mr. Turnage in an email.  On December 19, 2014,

Jeff Power, a new Gemstone employee, sent Mr. Turnage the following message:

> I have attached labels that were being used during cross docking for
> Canebreak Trading (Bill To) and Food Pro (Ship To) in the past.  This
> is a violation of USDA regulations and would be considered knowingly
> mislabeling and misbranding product and could result in a withdrawal
> of Grant of Inspection.
>
> This was ceased immediately upon finding this violation.

(Doc. 422-129, p. 2).  Mr. Turnage responded:  "Thanks Jeff-  I guess we need to

'inventory' our labels-  Who handled most of the actual leg work on this-  Matthew?

I had no idea this wasn't on the clear up and up-  I am certainly glad you put a stop

to it."  (Doc. 422-129, p. 2).[32]

Galleria used fake RCF bills of lading as late as March and May of 2015 after

Mr. Welborn, Mr. Pass, and Mr. Wester left Gemstone to join Eddie Hill's new

chicken processing company, Farm Fresh Foods.  (Docs. 454-19, 454-20, 454-21,

454-23).

During discovery, Mr. Wester had difficulty recalling the moonlighting he,

Mr. Pass, and Mr. Welborn were doing for Mr. Lenoir.  Eddie Hill also struggled to

recall the work that Galleria performed for Mr. Lenoir.  At Mr. Wester's first

deposition on July 29, 2020, Gemstone's attorney asked him about several RCF bills

---

[32] There is no evidence that Mr. Turnage was aware of the PWW and Galleria operations.  Mr. Ensley had left Gemstone by December 2014, so he was not involved in the label discussion.

of lading and PWW invoices for shipments of chicken that Mr. Wester emailed to or received from different people from October 2014 to January 2015. (Doc. 454-1, pp. 37–42, tpp. 146–68; *see* Doc. 419-2, pp. 3–18; Doc. 419-3, pp. 2–12; Doc. 419-4, pp. 2–8). At least four invoices bear the name "PWW, LLC." (Doc. 419-2, pp. 4–5, 16, 18). Mr. Wester testified that the PWW invoices represented chicken that was coming to the dock at Gemstone. (Doc. 454-1, p. 38, tp. 152). Mr. Wester could not recall what PWW was, did not recognize the address listed for PWW, did not know whether PWW was the intended recipient of payments on the invoices, and did not remember sending the invoices. Mr. Wester testified that he would use his personal email to send PWW invoices to other Gemstone employees at their personal email addresses if Gemstone's email was not working. (Doc. 454-1, pp. 39–40, tpp. 153–57).

At his deposition on December 9, 2020, Eddie Hill did not recognize several emails and RCF bills of lading that Mr. Wester sent to him, Mr. Pass, and Mr. Lenoir in 2014 and 2015. (Doc. 422-3, pp. 8–12, tpp. 28–37, 42–44). Eddie Hill testified that he did not do work with Mr. Lenoir before Farm Fresh was created. (Doc. 422-3, p. 9, tp. 29). Eddie Hill testified that he did not know why Mr. Wester was sending bills of lading labelled RCF to him. (Doc. 422-3, pp. 8–9, tpp. 28–30). After being shown several RCF bills of lading prepared by Mr. Wester or Mr. Pass in 2015 while they were employed by Farm Fresh, Eddie Hill testified that he was not aware that

Farm Fresh employees were preparing RCF bills of lading, and he did not know why Mr. Wester, while working at Farm Fresh, would create RCF bills of lading.  (Doc. 422-3, pp. 10–11, 13, tpp. 33–39, 45–46).

During his January 19, 2021 deposition, Mr. Pass testified that Mr. Wester owned part of PWW and was instrumental to its operation.  Mr. Pass testified that PWW—which stands for "Pass Welborn Wester"—was a "limited liability company that was opened with [Mr. Pass] and Mark Welborn and Matthew Wester."  (Doc. 454-3, p. 23, tp. 91).  Those three defendants started PWW to bill Canebrake, Mr. Lenoir's company, for "inspecting or cross docking product."  (Doc. 454-3, pp. 23, 28, tpp. 91–92, 111).  Mr. Pass testified that Eddie Hill started Galleria in 2014, and Mr. Wester, Mr. Pass, and Mr. Welborn joined Galleria at some point.  (*See* Doc. 454-3, pp. 38–39, tpp. 149–53; *see generally* Doc. 454-17, pp. 1, 3).  Mr. Pass explained that Galleria performed the same work as PWW in the same way for Mr. Lenoir/Canebrake and billed Canebrake with an invoice and a false RCF bill of lading, as PWW did.  (Doc. 454-3, pp. 38–40, tpp. 150–58; *see generally* Doc. 454-17, p. 1 (indicating Galleria invoices connected with bills of lading)).

Before Mr. Pass's deposition concluded, Mr. Wester's attorney emailed Gemstone's attorney to advise him that Mr. Wester had "recalled some information concerning an issue about which he did not have recollection at the time of the

deposition, namely an entity known as PWW, LLC." (Doc. 454-4, pp. 1–2). So Gemstone's attorney deposed Mr. Wester a second time.

At his second deposition on March 16, 2021, Mr. Wester confirmed that "PWW was a company that Shane Pass, Mark Welborn, and [he] started to do inspections for Brad Lenoir." (Doc. 454-5, p. 3, tp. 9). Mr. Wester admitted that he created the PWW invoices that he was shown at his first deposition on a computer at his house. (Doc. 454-5, p. 3, tpp. 11–12). Mr. Wester did not save the PWW invoices that he created. (Doc. 454-5, pp. 3–4, tpp. 12–13). Mr. Wester confirmed that the bills of lading he prepared to accompany PWW invoices were "inaccurate," "false," and "fictional" because they represent shipments of chicken from RCF, but no product that PWW inspected actually came from RCF. (Doc. 454-5, pp. 6, 13, tpp. 22–24, 50). The bills of lading did not include carrier information because no trucking company picked up chicken from RCF. (Doc. 454-5, pp. 6, 9, tpp. 22, 33). Mr. Wester testified that Mr. Pass, Mr. Welborn, Mr. Lenoir, and Eddie Hill all knew that he was creating fictional bills of lading. (Doc. 454-5, pp. 13–14, tpp. 52–53). Mr. Wester denied involvement in the labeling of loads of chicken for Canebrake. (Doc. 454-5, p. 10, tpp. 39–40).

Counsel for the plaintiffs asked Mr. Wester if it was uncommon for a company to need inspection services like those provided by PWW and Galleria. (Doc. 454-5, p. 14, tp. 55). Mr. Wester answered, without explanation, that inspections were

common, but he could not remember another company that requested inspection services. (Doc. 454-5, p. 14, tp. 55). Mr. Wester agreed that ten cents per pound was a substantial cost for any service connected with chicken. (Doc. 454-5, p. 15, tp. 57).

Gemstone's attorney deposed both Mr. Pass and Eddie Hill a second time as the Rule 30(b)(6) corporate representatives of Galleria. (*See* Doc. 454-27, pp. 2, 13, tpp. 7–8, 49–50). For his part, Eddie Hill called it "[j]ust an oversight" that he neglected to mention Galleria at his first deposition. (Doc. 454-27, p. 23, tp. 92). He did not know whether Galleria was involved in labeling products in shipments from Mr. Lenoir. (Doc. 454-27, p. 17, tp. 68). Eddie Hill acknowledged that he prepared Canebrake invoices for Galleria. (Doc. 454-27, p. 15, tp. 59). He suspected that the Galleria invoices were destroyed because he cleans out his files every three years. (Doc. 454-27, p. 15, tp. 60).[33]

In his 30(b)(6) deposition for Galleria, Mr. Pass again confirmed several fake RCF bills of lading that accompanied shipments of chicken inspected by Galleria. (Doc. 454-27, pp. 5–7, tpp. 19–25). Mr. Pass testified that the incoming bill of lading

---

[33] Email evidence indicates that Mr. Wester, Mr. Pass, Mr. Lenoir, and Mr. Hill were accustomed to purging documents. On May 31, 2014, Mr. Gilchrest sent an email from his Gemstone account to Mr. Wester at his Gemstone account: "FOOD PRO LOAD WILL DELETE AFTER SENDING THANKS." (Doc. 454-13, p. 1). A RCF/Food Pros bill of lading prepared using the RCF MASTER BOL.xls template is attached to the email. (Doc. 454-13, p. 2). Mr. Wester forwarded the message to his personal Hotmail account and then sent the message to Eddie Hill, Mr. Lenoir, and Mr. Pass. (Doc. 454-13, p. 1).

for a shipment inspected by Galleria indicated the age of the chicken: "mature." (Doc. 454-27, p. 6, tp. 21).[34]

Mr. Pass reviewed documentation showing that Border City USA, a company that imported chicken to Canada, received a shipment of chicken in August 2013 that was accompanied by an RCF bill of lading. (Doc. 454-27, p. 10, tpp. 37–40). Mr. Pass communicated with a representative of Border City USA in August 2013 and forwarded Mr. Lenoir a blank email with a document named "RCFlabelfail." (Doc. 454-27, p. 12, tpp. 45–47). Mr. Pass could not recall whether he discussed RCF labels with Border City USA or Mr. Lenoir. (*See* Doc. 454-27, pp. 11–12, tpp. 43–48). Mr. Pass also could not recall details about the August 2013 shipment. (*See* Doc. 454-27, pp. 10–12, tpp. 40–48).

---

[34] According to USDA's "United States Classes, Standards, and Grades for Poultry," Agricultural Marketing Service ("AMS") § 70.201, which governs the grading of poultry pursuant to 7 C.F.R. § 70.10(a), "mature" chicken is "usually more than ten months of age," has meat less tender than younger chickens, is referred to as "hen, fowl, or baking or stewing chicken" if female, and referred to as "cock or rooster" if male. AMS § 70.201(f)–(g), available at https://www.ams.usda.gov/sites/default/files/media/PoultryStandard.pdf. The Canada Border Services Agency calls this kind of chicken "spent fowl." *See* Canada Border Services Agency, Memorandum D10-18-8 (June 30, 2020), available at https://www.cbsa-asfc.gc.ca/publications/dm-md/d10/d10-18-8-eng.html. Cuts of fresh "spent fowl" imported to Canada from the United States, unlike young or "broiler chicken," are not subject to a tariff. Canada Tariff Code 0207.13.10.00, available at https://www.tariffinder.ca/en/search/import/US/spent%20fowl/0207131000; Report CA2021-0048 "Poultry and Products Annual," USDA Foreign Agricultural Service, available at https://apps.fas.usda.gov/newgainapi/api/Report/DownloadReportByFileName?fileName=Poultry%20and%20Products%20Annual_Ottawa_Canada_09-01-2021.pdf, p. 7.

### *Employees Leave Gemstone for Farm Fresh*

As noted, Mr. Ensley parted ways with Gemstone at the end of November 2014.  Early in December of 2014, Mr. Pass told Mr. Welborn that he had overheard a conversation in which Mr. Turnage and Mr. Power were discussing plans to replace Mr. Welborn.  (Doc. 422-4, p. 18, tp. 65).  A few weeks later, Mr. Wester brought Mr. Welborn a copy of an email which discussed Mr. Welborn's replacement.  (Doc. 422-4, p. 18, tp. 65).  Mr. Welborn then spoke to Eddie Hill about the possibility of starting a poultry processing company.  (Doc. 422-4, p. 20, tp. 74).  Mr. Welborn told Eddie Hill that they would need Mr. Ensley and Ms. Carr to make a new company work, and recruiting Mr. Ensley would be challenging because he hated Eddie Hill.  (Doc. 422-4, p. 20, tp. 74).  Ultimately, Mr. Welborn struck a "handshake agreement" with Mr. Ensley that he (Mr. Ensley) would "get the business," and Mr. Welborn would run it.  (Doc. 422-4, p. 23, tp. 88).[35]

Eddie Hill founded Farm Fresh Foods, LLC in January of 2015.  On January 20, 2015, Mr. Pass, Mr. Wester, Mr. Welborn, Gary Hill, Sasha Cruz, and Rhonda Beasley became members of Farm Fresh.  (Doc. 422-77, p. 2; *see* Doc. 422-82, p.

---

[35] In his deposition, Mr. Turnage stated that Mr. Ensley and Ms. Carr invested the proceeds of their invoicing scheme in Farm Fresh.  (Doc. 422-1, p. 67, tpp. 255–56).  Mr. Turnage called it "obvious" that that money was "part of the capitalization" of Farm Fresh.  (Doc. 422-1, p. 67, tpp. 255–57).  Mr. Ensley and Eddie Hill testified that Mr. Ensley and Ms. Carr did not invest in Farm Fresh and have never been owners or members of the company.  (Doc. 422-2, p. 5, ¶ 18; Doc. 422-3, pp. 21, 28, tpp. 78–79, 107).  Instead, Mr. Ensley provided consulting services to Farm Fresh and Ms. Carr/AAA was one of Farm Fresh's vendors.  (Doc. 422-2, p. 5, ¶ 18; Doc. 422-3, p. 21, tpp. 78–79).

2).  Per the terms of the Farm Fresh operating agreement, each member was an equity owner in the company proportional to their capital contributions to the company. (Doc. 422-79, p. 2).  Mr. Welborn owned 10%, Mr. Pass, Mr. Wester, and Ms. Campos each owned 5%, Gary Hill owned 3%, and Ms. Beasley owned 1% of Farm Fresh.  (Doc. 422-77, p. 2).[36]  Mr. Welborn testified that each person had to pay $10 per each 1% share of Farm Fresh, so he paid $100 for his 10% interest, (Doc. 422-4, p. 22, tp. 82), and Mr. Wester paid $50 for his 5% interest, (Doc. 422-8, p. 9, tp. 29).

Eddie Hill bought property in Guntersville to house Farm Fresh's business. He paid $885,000 for the property.  (Doc. 422-82, p. 2).  The purchase agreement shows that he paid $162,000 in cash and $15,000 in earnest money, and he used $708,000 from a loan.  (Doc. 422-82, p. 2).  Eddie Hill used a line of credit from Progress Bank to finance Farm Fresh's startup expenses.  (Doc. 422-3, p. 20, tpp. 74–75).[37]

Before they officially joined Farm Fresh as owners, on January 13, 2015, Mr. Wester shared with Mr. Pass an estimate for equipment for the Guntersville facility.

---

[36] "Sasha Cruz" in Doc. 422-77 is Ms. Campos.  (*See* Doc. 422-7, p. 14, tpp. 51–52).

[37] In his deposition, Mr. Turnage stated that Farm Fresh used money that Eddie Hill stole from Gemstone through Galleria to fund Farm Fresh.  (Doc. 422-1, p. 67, tpp. 256–57).  Mr. Turnage has no first-hand knowledge of a link between the proceeds from Galleria's work and the initial funding for Farm Fresh.  (Doc. 422-1, p. 67, tp. 257).

(Doc. 419-4, p. 10).  On January 15, 2015, Mr. Pass received and shared with Mr. Welborn and Mr. Wester a quote for cutting tables for the Guntersville facility. (Doc. 419-4, pp. 15–18).   Neither Mr. Wester nor Mr. Pass (nor any of the defendants) had non-compete or non-solicitation agreements with Gemstone.  (Doc. 422-1, p. 66, tp. 252).

Mr. Wester resigned from Gemstone on February 16, 2015.  (Doc. 422-8, p. 45, tpp. 177–78).  Gemstone fired Mr. Welborn in February 2015 for allegedly not coming to work enough.  (Doc. 422-1, p. 63, tpp. 238–39).  The other members of Farm Fresh migrated to the new company early in 2015.[38]

Before leaving Gemstone, Gary Hill, Mr. Pass, and Mr. Wester emailed themselves and Mr. Ensley several Gemstone documents.  On January 29, 2015, Gary Hill sent himself and Mr. Ensley Gemstone's "Sales by Customer Detail" reports for January 2015.  (Doc. 525-33; Doc. 525-34; *see also* Doc. 525-38 (Gary Hill sending himself updated reports one week later)).  The documents contained Gemstone's pricing information for its customers for January 2015.  Gary Hill also sent himself Gemstone's UB market data.  (Doc. 525-35).  On February 26, 2015, the day before he left Gemstone, Gary Hill emailed himself several Gemstone documents:   provider directories; a customer order form; supplier quotes; a

---

[38] Before they left Gemstone, a private investigator for Gemstone interviewed Mr. Pass, Ms. Campos, Gary Hill, and Ms. Beasley.  The investigator also interviewed Mr. Wester and Mr. Welborn.  (*See generally* Doc. 422-80).

spreadsheet for several months of Gemstone's weekly yields; and a bill of lading log detailing a substantial number of Gemstone transactions in 2015.  (Doc. 525-39).

On January 3, 2015, Mr. Pass emailed Mr. Ensley Gemstone's "Outside Portion Packet 12-27-14 Super Master" spreadsheet of data about several Gemstone transactions.  (Doc. 525-40).  On January 27, 2015, Mr. Pass emailed himself several Gemstone load descriptions, purchase orders, and meat schedules.  (Doc. 525-44). On January 29, 2015, Mr. Pass emailed himself a document named "gemstone_schedule.accdb" that lists contact information for freight companies. (Doc. 525-45).

On December 17, 2014, Mr. Wester emailed himself a picture of Gemstone's upcoming schedule for the week showing anticipated shipments from Tyson.  (Doc. 525-48).  And on January 13, 2015, Mr. Wester emailed himself RCF's master bill of lading and Gemstone's scheduling database.  (Doc. 525-50; Doc. 525-51).

While they were still employed with Gemstone, Gary Hill created financial projections for Farm Fresh,  (Doc. 525-31), and Mr. Pass and Mr. Wester gathered quotes for Farm Fresh from suppliers and contractors, (*see* Docs. 525-41, 525-42, 525-43, 525-46, 525-47, 525-52).

Farm Fresh's first customer was Koch Foods.  (Doc. 422-2, p. 5, ¶ 19).  Koch Foods was a customer of Gemstone.  (*See* Doc. 422-1, pp. 23, 67, tpp. 79, 254).  Mr. Ensley testified that Koch Foods told him that it ordered custom portioned small

chicken tenders from Farm Fresh instead of Gemstone because managers at Gemstone turned down Koch Foods's order.  (Doc. 422-2, p. 6, ¶ 19).

After most of its managers left the company for Farm Fresh in early 2015, Gemstone's new management team consisted of Tommy Knight, Vice President of Operations; Stites Easterling, Vice President of Sales, Marketing, and Purchasing; Gil Moats, Controller; and Jordan Scott, Operations Manager.  (Doc. 422-1, p. 62, tpp. 235–37; Doc. 422-10, p. 9, tp. 23; Doc. 422-13, p. 48, tp. 179; Doc. 422-14, p. 6, tpp. 11, 13).  Each of these managers testified that they were not aware of customers that Gemstone lost to Farm Fresh.  (Doc. 422-10, p. 49, tp. 182; Doc. 422-11, p. 37, tp. 135; Doc. 422-13, p. 30, tpp. 108–09; Doc. 422-14, p. 33, tp. 119).

At his deposition, Mr. Turnage testified that he had "a list of [Farm Fresh's] customers in 2015 that were customers of Gemstone," but he could not remember any of them except Koch Foods and Tyson.  (Doc. 422-1, p. 67, tpp. 254–55).  For the most part, Mr. Turnage testified that he did not know exactly how Farm Fresh acquired Gemstone's customers, (Doc. 422-1, pp. 67–68, tpp. 254–59), but he knew that Farm Fresh "created this competing business with our stolen documents and our stolen money and our senior management people to go out and compete with us. And they knew and took the business . . . from some of the customers that Gemstone was doing," (Doc. 422-1, p. 67, tp. 255).

The list to which Mr. Turnage referred at his deposition shows that Farm Fresh made a substantial number of sales to Tyson, Dallas USA, Koch Foods, AlaCarte Foods, Inc., Performance Food Group, and several other companies in 2015. (Doc. 525-25). Those sales were worth millions of dollars. (Doc. 525-25).

### Mr. Wester's Laptop

While working for Gemstone, Mr. Wester used a Toshiba laptop. (Doc. 419-1, pp. 20–21, tpp. 73–80). He surfed the internet, backed up data, and answered emails on the laptop. (Doc. 419-1, pp. 20–21, 53, tpp. 76–80, 207). At some point, with the help of William Wicker, he got access to Gemstone employees' email accounts on the laptop. (Doc. 419-1, p. 53, tpp. 205–06; Doc. 419-7, pp. 52–53, tpp. 197–98). Mr. Wester would email Mr. Wicker when a new Gemstone employee needed an Outlook email account. (Doc. 419-1, p. 53, tpp. 205–06). Mr. Wicker would respond with a username and password for the employee, and the initial password was the same for all accounts. (Doc. 419-1, p. 53, tpp. 205–06).

By October 2014, Mr. Wester had backed up the Outlook accounts of himself, Mr. Pass, Ms. Campos, Mr. Welborn, Gary Hill, Ms. Beasley, Janelle Duncan, Mr. Gilchrist, Mr. Power, Mr. Easterling, and Mr. Knight on the Toshiba laptop. (Doc. 419-1, pp. 53–54, tpp. 207–09). Mr. Wester testified that he backed up those

accounts on his laptop to help employees find emails that they could not locate on their own computers.  (Doc. 419-1, p. 54, tpp. 209–10).[39]

At some point in late 2014, Eddie Hill offered Mr. Wester, who was at that time the QA manager for Gemstone, more money and an ownership interest in Farm Fresh to leave Gemstone and work for Farm Fresh.  (Doc. 419-1, pp. 10–12, tpp. 35–38, 41–42).  Mr. Wester accepted the offer.  (Doc. 419-1, p. 30, tp. 115).  He left Gemstone on February 16, 2015.  (Doc. 419-1, pp. 16, 46, tpp. 58, 177–78).  He had sole possession of the Toshiba laptop through sometime in March 2015 when he turned the laptop over to Gary Hill at Mr. Ensley's direction.  (Doc. 419-1, pp. 20, 22–23, 27, 29, 36, tpp. 74–76, 84–85, 103–04, 112, 140).[40]  The laptop was stored in the shipping and receiving department at Farm Fresh.

At first, Mr. Wester testified that he did not use the laptop in 2015.  (Doc. 419-1, pp. 22–23, tpp. 84–86).  But then he testified that he created "PST accounts" – meaning .pst (Personal Storage Table) files which are exports of emails, documents, and other data from an email account – for several Gemstone employees' email accounts on the laptop in early 2015 while he was still employed by Gemstone.  He created PST accounts for Mr. Welborn on January 1; Ms. Campos, Mr. Gilchrist,

---

[39] Mr. Wester indicated that his colleagues knew that he added their email accounts to the laptop. (Doc. 419-1, p. 54, tp. 212).  His colleagues do not recall those conversations.  (*See*, *e.g.*, Doc. 422-4, p. 27, tpp. 101–02).

[40] This is Mr. Wester's version of events.  The details of how the laptop ended up in Farm Fresh's shipping and receiving department are disputed among the defendants.

and Mr. Power on January 8; and Mr. Knight on January 14.  (Doc. 419-1, pp. 25–26, tpp. 95–97).

The .pst file for Mr. Wester's email account was downloaded onto the laptop on February 16, 2015, the day he left Gemstone, but Mr. Wester does not recall creating that .pst file.  (Doc. 419-1, p. 26, tp. 98).  He testified:  "My e-mail would have already been on there," but he did not address how creating a .pst file for an email account is different from an Outlook email account.  (Doc. 419-1, p. 25, tp. 98).  No evidence suggests that anyone else created the .pst files or used the laptop on February 16, 2015.

Mr. Wester continued downloading .pst files onto the laptop for Gemstone employees after he left Gemstone.[41]  He downloaded the .pst file for Gary Hill on February 25, 2015 and for Ms. Duncan and Ms. Beasley on February 26, 2015.  (Doc. 419-1, p. 26, tpp. 98–100).[42]

---

[41] Mr. Wicker testified that Gemstone did not cut off access to the departed employees' email accounts until March 16, 2015.  (Doc. 419-7, p. 54, tpp. 202–05).

[42] Describing "[w]hich [email accounts] would be picked" for .pst filing, in his first deposition, Mr. Wester stated:

Q.	Which ones would be picked?
A.	It -- just open it up.
Q.	What do you mean just open it up?
A.	Once you open the laptop, if that program is running it's going to download.
Q.	Okay.  So you had it set up to download and populate all of the e-mails from these accounts is what you're saying if it was opened?
A.	If it's opened and that program is running, then it will download.
Q.	Which program?
A.	Outlook.

Gemstone's attorney retained Dr. Gavin W. Manes to perform a forensic examination of the laptop. (Doc. 454-28). Dr. Manes's examination uncovered several Gemstone documents that Mr. Wester converted into Farm Fresh documents. (*See* Doc. 419-1, pp. 31–35, tpp. 119–34; Doc. 454-28, pp. 5–6, 8–9, ¶¶ 25–26, 34–38). The laptop had a folder called "Farm Fresh Foods Policy" that was created on February 23, 2015. (Doc. 454-28, p. 8, ¶ 36). According to Dr. Manes, "[t]he folder contains many documents that are originally Gemstone documents that have been repurposed with Farm Fresh Foods' name." (Doc. 454-28, p. 8, ¶ 36). Dr. Manes listed 52 files in that folder that "carrie[d] at least some metadata from the original Gemstone version." (Doc. 454-28, p. 8, ¶ 36, pp. 43–46).

The record contains several examples of repurposed Gemstone documents on the Wester laptop. First, the laptop had two bio-security control procedure documents – prepared to explain how to prevent contamination in poultry – that Mr. Wester created. (Doc. 419-1, pp. 31–32, tpp. 119–22; Doc. 419-1, pp. 82, 85). The first document is dated May 19, 2014, applies to Gemstone, and is marked "confidential proprietary information of Gemstone Foods." (Doc. 419-1, p. 82). The

---

Q.    Okay. Did you open -- well and you -- you opened the computer then apparently in January 2015?
A.    Yeah.
Q.    In fact, you opened it quite a few times in 2015?
A.    I was employed by Gemstone.

(Doc. 419-1, p. 28, tpp. 106–07).

second document is dated March 2, 2015, applies to Farm Fresh, and is marked "confidential proprietary information of Farm Fresh Foods." (Doc. 419-1, p. 85). Mr. Wester prepared both documents by copying language that his mother had previously created for another company. (Doc. 419-1, p. 32, tpp. 123–24). The documents are effectively identical. (*See* Doc. 419-1, pp. 82, 85).

The forensic examination of the laptop also uncovered a "Country of Origin Policy" document – establishing that all materials used must be produced in the United States – that Mr. Wester created for Farm Fresh on February 23, 2015. (Doc. 419-1, p. 33, tpp. 126–28; Doc. 419-1, p. 88). The document applies to Farm Fresh and is marked "confidential proprietary information of Farm Fresh Foods," but Mr. Wester signed the document as QA Director for Gemstone. (Doc. 419-1, p. 88). He testified that he created the Farm Fresh document by modifying a Gemstone document on the laptop and that the Gemstone document came from Diamond Foods. (Doc. 419-1, pp. 33–34, tpp. 127–29).

The forensic examination of the laptop uncovered an "Emergency Contingency Plan" document that Mr. Wester created to explain steps Farm Fresh should follow in a natural disaster. (Doc. 419-1, p. 34, tpp. 129–31; Doc. 419-1, p. 91). Though the document applies to Farm Fresh, it is marked "confidential proprietary information of Gemstone Foods." (Doc. 419-1, p. 91). Mr. Wester

testified that he prepared the document by converting a Gemstone document found on the laptop. (Doc. 419-1, p. 34, tpp. 129–32).

The forensic examination of the laptop also uncovered "Outbound Procedure," "Incoming Materials Verification Process," and "Raw Supplier Approval Procedure" documents that Mr. Wester created for Farm Fresh in February 2015 and that were issued on March 2, 2015. (Doc. 419-1, pp. 34–35, tpp. 132–35; Doc. 419-1, pp. 94–101). The three documents have the same characteristics: they apply to Farm Fresh, are marked "confidential proprietary information of Farm Fresh Foods," but contain language showing they were copied from Gemstone documents. (*See* Doc. 419-1, pp. 94–101). Mr. Wester confirmed as much at his deposition. (Doc. 419-1, pp. 34–35, tpp. 132–36).

The forensic examination of the laptop revealed that 18 different USB storage devices were plugged into the laptop following January 2015. (Doc. 419-1, p. 102). Five devices were connected to the laptop before Mr. Wester left Gemstone. (Doc. 419-1, p. 102). Most of devices were used in January, February, and March of 2015. (Doc. 419-1, p. 102). The last USB drive was plugged into the laptop in July 2018. (Doc. 419-1, p. 102). At his deposition, Mr. Wester did not recognize the devices and did not recall plugging a storage device into the laptop in 2015 except for a thumb drive from his mother in early 2015. (Doc. 419-1, pp. 36–37, tpp. 138–39, 141).

Mr. Wester testified that, while he was employed by Gemstone, he set up a shared Google Drive account that would download onto his laptop and all Gemstone computers.  (Doc. 419-1, p. 28, tp. 107).  He testified that he did not remember when he created the account or what documents would have been on the Google Drive, not even whether Gemstone corporate documents would have been on the Google Drive.  (Doc. 419-1, pp. 27–28, tpp. 108–09).  The forensic examination revealed that all data from the Google Drive account – more than 8,300 files and folders – was downloaded on the laptop "using the account mwester805@gmail.com" on February 25, 2015.  (Doc. 454-28, p. 5, ¶ 25).  The data except for one folder and two files were created before February 4, 2015.  (Doc. 454-28, pp. 5–6, ¶ 25).  According to Dr. Manes, most of the files and folders in the Google Drive "appear to be Gemstone data."  (Doc. 454-28, p. 6, ¶ 25).  Eleven files and folders were modified after Mr. Wester left Gemstone.  (Doc. 454-28, p. 6, ¶ 26).  The names of the modified folders and files suggest that many of the modified documents were the policy documents discussed above.  (*See* Doc. 454-28, p. 6, ¶ 26).

Moreover, the forensic examination of the laptop revealed that the laptop was used (without evidence of the identity of the user) 24 times in February 2015, 41 times later in 2015, 7 times in 2016, 9 times in 2017, and twice in 2018.  (*See* Doc. 454-28, p. 74).

54

Dr. Manes found "potentially privileged Gemstone data created on Mr. Wester's laptop." (Doc. 454-28, p. 11). The data includes several Microsoft Word documents created on December 15, 2017 that contain copies of Gemstone emails, a "Microsoft Excel document that appears to be a Gemstone financial statement," and several Microsoft Word documents that contain Gemstone emails and were sent from Mr. Gilchrist's Farm Fresh email address to Gary Hill on January 9, 2018 or later. (Doc. 454-28, pp. 12–13, 76–114).[43] One of those Word documents contains the email message that Mr. Wester brought to Mr. Welborn that caused Mr. Welborn to approach Eddie Hill about forming a chicken portioning company. (Doc. 454-28, p. 79). The email originally was sent from Mr. Knight to Mr. Turnage, Mr. Easterling, and Mr. Power on December 19, 2014. Mr. Wester is not copied on the email. (Doc. 454-28, p. 79; *see also* Doc. 454-28, pp. 84, 112).

**DONE** and **ORDERED** this February 11, 2022.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE

---

[43] The Word documents were created on December 15, 2017, just over two years after the complaint was filed in this lawsuit. Mr. Wester disclosed the Toshiba laptop to the attorneys for the defendants shortly after the Word documents were created.