FILED

2022 Feb-12  PM 01:53
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **GEMSTONE FOODS, LLC et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 5:15-cv-02207-MHH** |
| | ) | |
| **AAA FOODS ENTERPRISES, INC. et al.,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **MICHAEL ENSLEY et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 5:15-cv-01179-MHH** |
| | ) | |
| **BEN O. TURNAGE et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**<u>MEMORANDUM OPINION – VOLUME II</u>**

**III.**

***Analysis of the Defendants' Motions for Summary Judgment***

The defendants have filed three motions for summary judgment:  an omnibus

motion for summary judgment as to all claims from all defendants except Mr.

Wester, (Doc. 414); a separate motion for summary judgment from Ms. Carr and AAA relating to the pricing claims against them, (Doc. 417); and a motion for summary judgment as to all claims from Mr. Wester, (Doc. 419).

As noted, Gemstone and RCF contend that, while the defendants were associated with Gemstone, they took advantage of Gemstone in two ways:  AAA invoiced Gemstone for more than $0.01 per pound for meat that Ms. Carr sourced for RCF to portion (and Mr. Ensley had Gemstone pay the inflated invoices), and Mr. Welborn, Mr. Wester, and Mr. Pass operated a sideline business that diverted work from Gemstone.  Gemstone also contends that, as the defendants broke their ties with the company, they combined to open Farm Fresh, a portioning company that competed with Gemstone; recruited dozens of Gemstone employees; took Gemstone documents and data; and diverted business from Gemstone.

Our analysis begins with two preliminary issues concerning the alleged AAA invoicing scheme and then proceeds through the defendants' arguments concerning the plaintiffs' state and federal law claims.  As we evaluate the defendants' arguments, we view the evidence in the light most favorable to Gemstone and RCF.

### *Evidence Supports the Existence of the Cost-Plus Agreement, and the Statute of Frauds Does Not Bar the Plaintiffs' Claims*

The defendants contend that the Court should disregard the alleged penny-per-pound agreement between Gemstone and Ms. Carr/AAA, and they argue that if the Court does so, then the plaintiffs' claims against the defendants will collapse like

a house of cards.  (*See* Doc. 414, pp. 41–51).[1]  The defendants argue that Gemstone has not established that a "cost-plus" agreement existed, (Doc. 414, p. 42 & n.20), and even if there is evidence of an agreement, the statute of frauds bars claims based on the agreement because the agreement is not in writing.  (Doc. 414, pp. 41–46; Doc. 417, pp. 30–48).[2]  Ms. Carr and AAA contend that there is no evidence of mutual assent to the price term.  (Doc. 417, pp. 24–30).

As for evidence of the "cost-plus" agreement, the defendants assert that the only evidence of the agreement is "Ben Turnage's uncorroborated testimony."  (Doc. 414, p. 42).  Much of this argument is about semantics.  Mr. Turnage labeled Gemstone's agreement with Ms. Carr/AAA a "cost-plus" agreement.  Ms. Carr submits that AAA did not have a "cost-plus" agreement with Gemstone.  (Doc. 238-2, p. 6, ¶ 23).  The label is insignificant; the terms of the agreement count.[3]  The evidence concerning the terms of the agreement starts with Mr. Turnage's testimony that Ms. Carr agreed to source chicken for Gemstone for $0.01 per pound.  Mr. Turnage's testimony is evidence capable of creating a genuine issue of fact.[4]

---

[1] Mr. Wester adopts this analysis in his summary judgment brief.  (Doc. 420, p. 11, n. 5).

[2] The defendants also argue that the penny-per-pound agreement is void for vagueness.  (Doc. 414, pp. 48–50).  But the agreement is not vague.  Its material terms are definite and simple:  Ms. Carr agreed that AAA would charge Gemstone one penny for each pound of meat she sourced for RCF to portion.

[3] Ms. Carr also disputes the terms alleged by Mr. Turnage.  (Doc. 238-2, p. 6, ¶ 23).

[4] *See Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020) ("[W]hen competing narratives emerge on key events, courts are not at liberty to pick which side they think is more credible.");

And Mr. Turnage's testimony regarding the penny-per-pound agreement is not uncorroborated.  Ms. Carr testified:  "[T]he original agreement was they were going to pay me, with their money, not mine, a penny a pound . . . he said . . . that I would be paid a penny a pound on the purchasing and two cents a pound on sales." (Doc. 525-1, p. 24, tpp. 94–95).  In a July 17, 2013 email that Ms. Carr sent to herself, she wrote:  "I will buy the meat from mt aire.  [I] sell gemstone and gemstone invoice [sic] overhill direct.  Gemstone pays me a penny brokerage."  (Doc. 525-10, p. 1). Later that year, Ms. Carr sent an email to Mr. Turnage in which she stated:  "I make .01-.02 on Gemstone and more on others I sell too [sic] because of the volume Gemstone buys and they pay me faster than some of the others."  (Doc. 422-64, p. 2).[5]  Mr. Turnage's testimony and Ms. Carr's statements about the penny-per-pound that she charged Gemstone for sourced meat, viewed in the light most favorable to Gemstone and RCF, creates a jury question regarding the existence of the pricing agreement.

---

*Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252–53 (11th Cir. 2013) ("To be sure, Feliciano's sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage[;] . . . a plaintiff's testimony cannot be discounted on summary judgment unless it is blatantly contradicted by the record, blatantly inconsistent, or incredible as a matter of law, meaning that it relates to facts that could not have possibly been observed or events that are contrary to the laws of nature.").

[5] As noted earlier, Gemstone agreed to pay AAA $0.02 per pound for one-off, small-volume loads of chicken.  (Doc. 263-1, p. 3, ¶ 4).

Viewed in the light most favorable to the plaintiffs, Ms. Carr's agreement to reduce her fee to half of one cent per pound ($0.005/pound) for sourcing chicken after Gemstone started using its own credit with suppliers provides additional circumstantial evidence of the cost-plus agreement.   The second agreement resembles the first – *i.e.*, charging a fee per pound – but Ms. Carr reduced her fee for locating chicken for RCF to process because she no longer was bearing the risk associated with using her credit to supply chicken to RCF for portioning.

Other than the credit risk, under its initial arrangement with Gemstone, AAA bore the cost of transportation.  It is undisputed that AAA did not bill Gemstone for transportation costs.  Ms. Carr said so in her deposition.  (Doc. 525-1, p. 39, tpp. 155–56).  In a June 2014 email to Mr. Turnage, Mr. Ensley explained that he (Mr. Ensley) paid Ms. Carr "just for buying [chicken] and not includ[ing] trucking, customers or profits to the equation."  (Doc. 422-66, p. 3).  The "customers" piece is undisputed too; Ms. Carr testified that, to help Gemstone get off the ground, under her initial arrangement with Gemstone, she did not charge Gemstone for the customers that she identified for portioned chicken.  In a November 2013 email to Mr. Turnage, Ms. Carr stated that Mr. Ensley would "just let[] [her] make money on selling Gemstone the raw material." (Doc. 240-1, p. 12).

Thus, the evidence, viewed in the light most favorable to the plaintiffs, cumulatively supports a reasonable inference that, beginning in 2013, Ms. Carr

agreed that AAA would charge Gemstone $0.01 per pound for chicken that Ms. Carr sourced for RCF's operations.

As to the statute of frauds, under the Uniform Commercial Code – the UCC, certain contracts for the sale of goods that are not memorialized in writing are unenforceable. *See* U.C.C. § 2-201 (AM. LAW INST. & UNIF. LAW COMM'N 1977). Alabama has adopted the UCC, and Alabama's statute of frauds is codified in Section 7-2-201 of the Code of Alabama. That section provides: "Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker." Ala. Code § 7-2-201(1).

The statute of frauds, like all of Article 2 of the UCC, applies only to contracts for the sale of goods. Ala. Code §§ 7-2-102, 7-2-201. "A contract that is exclusively for services, therefore, is not governed by Article 2." *BMC Indus., Inc. v. Barth Indus., Inc.*, 160 F.3d 1322, 1329 (11th Cir. 1998). "Courts are frequently faced, however, with contracts involving both goods and services—so-called 'hybrid' contracts." *BMC Indus.*, 160 F.3d at 1329. To determine whether the UCC governs a hybrid contract, "[m]ost courts follow the 'predominant factor' test." *BMC Indus.*, 160 F.3d at 1329. Under this test, if the "predominant factor," "thrust," and

"purpose" of the contract "is the rendition of service, with goods incidentally involved," then the UCC does not govern the contract. *BMC Indus.*, 160 F.3d at 1329–30.  On the other hand, if the "predominant factor," "thrust," and "purpose" of the contract "is a transaction of sale, with labor incidentally involved," then the UCC governs the contract. *BMC Indus.*, 160 F.3d at 1330.

Here, the evidence, viewed in the light most favorable to the plaintiffs, indicates that the agreement between Ms. Carr/AAA and Gemstone is a "hybrid contract."  It involves goods – raw poultry – and an array of services.  A reasonable jury could credit the following evidence and find that Ms. Carr and AAA predominantly provided brokerage and related services to Gemstone and RCF:

- Ms. Carr made the following statements in her first summary judgment declaration describing brokerage and related services:  "AAA is a broker in the poultry industry, securing meat for processing facilities and then, in some instances, helping the processing facility sell the finished cutlets to a purchaser"; "In April 2013, AAA began sourcing meat for Gemstone Foods, LLC to process"; "Gemstone needed AAA's contacts in the poultry industry to secure meat to process, manage transport of the meat, and locate purchasers for the finished cutlets"; "Gemstone . . . relied on AAA to locate purchasers for the finished cutlets"; and "AAA arranged all transportation needs for

Gemstone, assuming responsibility for the meat while in transit." (Doc. 238-2, pp. 3–4, ¶¶ 3, 5, 7–8, 12).

- In the July 17, 2013 email, Ms. Carr stated that Gemstone paid her a "penny brokerage." (Doc. 525-10, p. 1).

- The record is flush with undisputed testimony that one of Ms. Carr's most crucial services for Gemstone was using AAA's longstanding credit with suppliers while Gemstone had none. (*See* Doc. 238-2, pp. 3–4, ¶ 9; Doc. 422-1, pp. 20, 33, 47, tpp. 67–68, 121, 175; Doc. 422-2, p. 4, ¶ 12; Doc. 422-4, pp. 41, 46, tpp. 159, 177; Doc. 422-18, pp. 23–24, 26, tpp. 88–89, 97; Doc. 525-1, pp. 31, 34, tpp. 124, 135–36).

- At her deposition, Ms. Carr testified that she performed services for Gemstone other than selling meat to Gemstone:

    > my agreement . . . from before Gemstone ever started was . . . I'd help them find a place to get it started . . . before they got opened, I helped them fill the plant up with sales[.] . . . I was doing everything, sells [sic], purchasing, accounting, transportation. . . .
    >
    > . . .
    >
    > My job was to source meat, keep the plant full of good quality meat, don't run them out, help with the transportation of that meat, help find staff for the plant and fill them up with sales volume, which was all those customers that you had asked me about, not all of them, because some of them weren't a good fit for Gemstone and I had that business elsewhere that fit them better, but my job was to fill the plant up with business . . . . I convinced [suppliers] to move their business to Gemstone, a

> totally unknown company that nobody knew anything about, but they trusted me. . . . [The suppliers] have to do the audits [of Gemstone] and they have to come in and get the specs and samples and all of that, and I convinced them to do that . . . .

(Doc. 525-1, pp. 24, 31–32, tpp. 93–94, 122–23, 125).  Ms. Carr emphasized in her deposition that her relationships with suppliers and customers were central to Gemstone's success.  Mr. Ensley put it this way:  the poultry business is "about respect and knowledge and the people you know and do they like you.  Do they trust you. . . . [I]t's not about the chick[en] – it's a people business, and you've got to have that knowledge."  (Doc. 422-18, p. 26, tpp. 98–99).

A reasonable jury could look at this evidence and see a clear picture of the scope of Ms. Carr's work under the penny-per-pound agreement:  Ms. Carr leveraged her relationships and credit with suppliers to source meat for Gemstone, brokered deals for Gemstone, helped Gemstone build credit with suppliers, located customers for Gemstone's portioned products, arranged transportation for Gemstone, and helped Gemstone recruit employees.  Therefore, evidence construed in the light most favorable to the plaintiffs shows that the UCC does not govern Ms. Carr's penny-per-pound agreement with Gemstone, and the statute of frauds does not bar claims based on the agreement.

### *RICO Claims*

RICO provides a private cause of action for treble damages to persons injured in their business or property by reason of a violation of one of the four subsections

of 18 U.S.C. § 1962.  18 U.S.C. § 1964(c).  A RICO private right of action requires proof of three elements:  "(1) a violation of 18 U.S.C. § 1962; (2) injury to business or property; and (3) causation."  *Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1066 (11th Cir. 2017) (citing *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991)).

In their third amended complaint, Gemstone and RCF assert the following RICO claims against all defendants:

- Count I – RICO violation under 18 U.S.C. § 1962(c).  (Doc. 391, p. 41);

- Count II – RICO violation under 18 U.S.C. § 1962(a).  (Doc. 391, p. 61);

- Count III – RICO conspiracy under 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(a).  (Doc. 391, p. 64); and

- Count IV – RICO conspiracy under 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(c).  (Doc. 391, p. 68).

To support their RICO claims, the plaintiffs allege four separate but related schemes:

- The invoicing scheme pursuant to which Ms. Carr, via email or wire, allegedly submitted and received payment on AAA invoices in which she charged more than $0.01 per pound for chicken that she sourced for Gemstone;

- The PWW/Galleria scheme pursuant to which Eddie Hill, Mr. Wester, Mr. Welborn, and Mr. Pass allegedly diverted business from Gemstone with a side business utilizing falsified RCF bills of lading;

- The Farm Fresh scheme pursuant to which several defendants allegedly used Gemstone's information and documents to form a competing business; and

- The Wester laptop scheme pursuant to which Mr. Wester allegedly used a laptop to download and copy many Gemstone documents and emails to benefit PWW, Galleria, and Farm Fresh.

(*See generally* Doc. 391).

The Court examines the plaintiffs' four RICO claims in turn.

### *1. Count I – RICO, 18 U.S.C. § 1962(c)*

Section 1962(c) forbids participation in a RICO enterprise.  Section 1962(c) provides:  "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  18 U.S.C. § 1962(c).  To establish a violation of § 1962(c), a plaintiff must prove four elements:  "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *Lehman v. Lucom*, 727 F.3d 1326, 1330 (11th Cir. 2013).

The first element, "conduct," refers to criminal conduct.  *See* 18 U.S.C. § 1961(1); *Roche Diagnostics Corp. v. Priority Healthcare Corp.*, 407 F. Supp. 3d 1216, 1237 (N.D. Ala. 2019).  The Supreme Court has held that "'to conduct or

participate, directly or indirectly, in the conduct of [a RICO] enterprise's affairs,' [18] U.S.C. § 1962(c), one must participate in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993). But "RICO liability is not limited to those with primary responsibility for the enterprise's affairs . . . ." *Reves*, 507 U.S. at 179. Rather, a defendant with "*some* part in directing the enterprise's affairs" may be liable under § 1962(c). *Reves*, 507 U.S. at 179 (emphasis in *Reves*). Also, "[a]n enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management. An enterprise also might be 'operated' or 'managed' by others 'associated with' the enterprise who exert control over it . . . ." *Reves*, 507 U.S. at 184 (footnote omitted).

For the second element, an "enterprise" is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "[T]he existence of an enterprise is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1284 (11th Cir. 2006) (*abrogated on other grounds as recognized in Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1212 (11th Cir. 2020)) (internal quotation marks and citation omitted).

12

For the third and fourth elements, "[t]o successfully allege a pattern of racketeering activity, plaintiffs must charge that:  (1) the defendants committed two or more predicate acts within a ten-year time span; (2) the predicate acts were related to one another; and (3) the predicate acts demonstrated criminal conduct of a continuing nature."  *Jackson v. BellSouth Telecommc'ns*, 372 F.3d 1250, 1264 (11th Cir. 2004); *see* 18 U.S.C. § 1961(5).

### a. Section 1962(c) claim regarding the invoicing scheme

The plaintiffs allege that Ms. Carr/AAA and Mr. Ensley/A&M's invoicing practices demonstrate conduct of an enterprise engaged in a pattern of racketeering activity.  The plaintiffs allege mail or wire fraud as RICO predicate acts.

Mail fraud and wire fraud are RICO predicate acts.  18 U.S.C. § 1961(1); *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 484 (1985).  "Mail fraud or wire fraud 'occurs when a person (1) intentionally participates in a scheme to defraud another of money or property and (2) uses the mails or wires in furtherance of that scheme.'"  *Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1317 (11th Cir. 1998); *see* 18 U.S.C. §§ 1341, 1343.  A "scheme to defraud" under the mail and wire fraud statutes "involves the making of misrepresentations intended and reasonably calculated to deceive persons of ordinary prudence and comprehension."  *Beck v. Prupis*, 162 F.3d 1090, 1095 (11th Cir. 1998), *aff'd*, 529 U.S. 494 (2000).

Here, Ms. Carr/AAA used mail or wire to submit invoices to Gemstone and receive payment on those invoices from Gemstone.  (*See, e.g.*, Doc. 263-1, p. 4, ¶ 5; Doc. 422-9, p. 21, tp. 73; Doc. 422-15, pp. 21, 31, tpp. 72, 112–13; Doc. 525-1, p. 36, tp. 142).  The question is whether there is evidence that Ms. Carr and AAA submitted those invoices as part of a scheme to defraud Gemstone – *i.e.*, did Ms. Carr and AAA make material misrepresentations or conceal a material fact to deceive Gemstone and cause Gemstone to pay more for sourced chicken than it had agreed to pay.

The contractual relationship between Ms. Carr/AAA and Gemstone complicates the analysis of that question.  If Ms. Carr invoiced Gemstone for more than $0.01 per pound of sourced chicken, then she arguably breached her fee agreement with Gemstone.  As a general rule, though, a breach of contract is not fraud.  *See Johnson Enters.*, 162 F.3d at 1318–19 (quoting *United States v. Kreimer*, 609 F.2d 126, 128 (5th Cir. 1980) ("[The mail fraud statute] does not reject all business practices that do not fulfill expectations, nor does it taint every breach of a business contract."), and *McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786, 791 (1st Cir. 1990) ("Nor does a breach of contract in itself constitute a scheme to defraud.")); *see also Perlman v. Zell*, 185 F.3d 850, 853 (7th Cir. 1999) ("Breach of contract is not fraud, and a series of broken promises therefore is not a pattern of fraud."); *United States v. D'Amato*, 39 F.3d 1249, 1261 n.8 (2d Cir. 1994)

("A breach of contract does not amount to mail fraud."). This is so even if a party breaches a contract for an extortionate purpose. *Johnson Enters.*, 162 F.3d at 1318.

In *Johnson Enterprises*, the case under which the defendants argue that the plaintiffs have not offered proof of a RICO predicate act for lack of evidence beyond an alleged breach of contract, a contractor brought RICO claims based on mail or wire fraud and alleged that a cable company intentionally delayed paying the contractor's invoices to extort the contractor into releasing its claims against the cable company. The Eleventh Circuit found that the cable company's undue delay in paying the contractor's invoices could not support a RICO claim against the cable company because the delay was "nothing more than breach of contract." *Johnson Enters.*, 162 F.3d at 1318. "This [was] so notwithstanding the allegation that [the cable company] delayed paying the invoices in order to extort a release from [the contractor] of its claims (other than those evidenced by the invoices) against [the cable company]." *Johnson Enters.*, 162 F.3d at 1318. The Eleventh Circuit explained: "Even if we were to assume that [the cable company] delayed paying [the contractor's] invoices for an extortionate purpose, [the cable company's] conduct would not constitute a 'scheme to defraud' proscribed by the mail and wire fraud statutes; thus, the acts of nonpayment could not serve as acts of racketeering." *Johnson Enters.*, 162 F.3d at 1318-(citing *Kreimer*, 609 F.2d at 128).

But breaches of contract in some circumstances may be a component of a RICO scheme to defraud.  *See Arabian Am. Oil Co. v. Scarfone*, 939 F.2d 1472, 1478 (11th Cir. 1991) ("[The defendant] has pointed to no federal case or statute prohibiting a plaintiff from bringing a RICO action where a breach of contract claim also exists.  In fact, many RICO cases involve contract disputes.") (citing *Sedima*, 473 U.S. at 499 n.16); *see also Perlman*, 185 F.3d at 853 ("It is correspondingly difficult to recast a dispute about broken promises into a claim of racketeering under RICO. . . .  Difficult is not impossible. Sometimes the evidence shows outright lies and a plan not to keep one's promises—enough of them to meet RICO's continuity-plus-relationship formula for a 'pattern.'") (internal citations omitted); *D'Amato*, 39 F.3d at 1261 n.8 ("Failure to comply with a contractual obligation is only fraudulent when the promisor never intended to honor the contract."); *McEvoy*, 904 F.2d at 791 (finding that breaches of contract can demonstrate mail or wire fraud when there is evidence of a "scheme . . . intended to *deceive* another, by means of false or fraudulent pretenses, representations, promises, or other deceptive conduct.") (emphasis in *McEvoy*).

For example, contract breaches were central to the alleged RICO scheme in *Norfolk S. Ry. Co. v. Boatright R.R. Prods., Inc.*, No. 2:17-cv-01787-AKK, 2021 WL 1264237 (N.D. Ala. Apr. 6, 2021).  There, the plaintiff railroad company brought RICO claims based on mail or wire fraud against the defendants who

allegedly misrepresented that they were adequately treating wooden railway ties pursuant to a contract between the parties. The defendants allegedly used substantially less chemical preservative than required, colored the wooden ties black to make them appear properly treated, generated false treatment reports, and mailed or emailed invoices to the plaintiff for the full price of properly treated ties. The defendants in *Norfolk S. Ry. Co.*, like the defendants here, argued that the RICO claims were based only on breaches of contract – *i.e.*, each invoice that the defendants sent to the plaintiff breached the contract to treat the wooden ties according to the terms of the contract. But the Court found that the plaintiffs offered proof of mail or wire fraud separate from but related to the defendants' contractual duties: the defendants fraudulently misrepresented their intention to perform under the contract by using counterfeit substances and false treatment reports to conceal that they were using less chemical preservative than required. *Norfolk S. Ry. Co.*, 2021 WL 1264237, at *4.

Similarly, in *In re Managed Care Litig.*, 298 F. Supp. 2d 1259 (S.D. Fla. 2003), the plaintiffs alleged that the defendant health insurance companies breached contracts by failing to pay certain claims. The plaintiffs brought RICO claims against the defendants based on mail fraud, alleging that the defendants "fail[ed] to disclose secret cost containment mechanisms—such as the use of computer software to review claims—that Defendants allegedly use to deny, diminish and delay

17

payment for covered, medically necessary services," and used "'cost-based or other actuarial criteria unrelated to [contractual and quasi-contractual] requirements to approve and deny claims submitted by Plaintiffs and the class.'" *In re Managed Care*, 298 F. Supp. 2d at 1277. The defendants argued that the plaintiffs alleged only breaches of contract because, by denying an insurance claim, the defendants only "announce[d] the disposition of a particular request for contractual reimbursement." *In re Managed Care*, 298 F. Supp. 2d at 1277.

The district court rejected the defendants' argument. *In re Managed Care*, 298 F. Supp. 2d at 1278. First, the district court noted that "contractual settings can provide the context for RICO mail fraud claims if there is a pattern of misrepresentations amounting to both a scheme to defraud and racketeering activity," and that "[c]oncealment of critical data, even without a formalized duty to disclose, may also constitute mail and/or wire fraud in certain situations." *In re Managed Care*, 298 F. Supp. 2d at 1278 (citing *Robert Suris Gen. Contractor Corp. v. New Metro. Fed. Sav. & Loan Ass'n*, 873 F.2d 1401, 1404 (11th Cir. 1989); *Kreimer*, 609 F.2d at 128; and *Langford v. Rite Aid*, 231 F.3d 1308, 1312–13 (11th Cir. 2000)). Second, the district court distinguished the alleged "fraudulent scheme based upon the failure to disclose a plethora of automated processing techniques to diminish, deny or delay payments" from the alleged scheme in *Johnson Enterprises*. *In re Managed Care*, 298 F. Supp. 2d at 1278. In *Johnson Enterprises*, "the

corporate defendant's undue delay in payment did not constitute criminal fraud as it did not constitute a 'scheme to defraud,'" whereas the failed disclosures alleged in *In re Managed Care* "go to 'the heart of [the plaintiffs' and the defendants'] relationship' and disclosure was necessary to prevent the doctors from being misled by Defendants' apparent actions and statements." *In re Managed Care*, 298 F. Supp. 2d at 1278. The district court concluded: "While Defendants insist on focusing on the individual contractual level in this class action, the Plaintiffs' allegations of a fraudulent scheme takes [sic] place on a far wider systematic level—a significant distinction. Accordingly, while their claims are indeed embedded in a contractual relationship, Plaintiffs' allegations of mail fraud continue to be viable." *In re Managed Care*, 298 F. Supp. 2d at 1278.

Several district courts have provided examples of patterns of breaches of contract that did not constitute racketeering. For example, in *Sanchez v. Team Health, LLC*, No. 18-21174-CIV-MARTINEZ-OTAZO-REYES, 2021 WL 4990803 (S.D. Fla. Mar. 31, 2021), the plaintiff class of physicians alleged that the defendant violated a compensation contract on several occasions by failing to pay for medical services rendered by providers under the physicians' supervision. The plaintiffs alleged: "Essentially, each time Defendants sent a paycheck to Plaintiff without compensation for [supervising other providers], Defendants committed mail and wire fraud." *Sanchez*, 2021 WL 4990803, at *4. The district court dismissed

the RICO claim because "allegations of withholding or delaying payment under a contract, even for extortionate purposes, do not constitute criminal mail and wire fraud. . . . Moreover, nondisclosure of an intent not to perform a contract generally cannot be used to bootstrap a fraud claim, since the mail and wire fraud statutes only proscribe representations designed to defraud." *Sanchez*, 2021 WL 4990803, at *4 (internal citations and quotation marks omitted).

In *Braswell Wood Co., Inc. v. Waste Away Grp., Inc.*, No. 2:09-CV-891-WKW[WO], 2010 WL 3168125 (M.D. Ala. Aug. 10, 2010), a contract between the defendant, a waste collection and disposal company, and the plaintiff, the defendant's customer, permitted the defendant to levy surcharges for increased costs in certain circumstances. The plaintiff brought a RICO claim against the defendant based on mail fraud, alleging that the defendant billed for fuel surcharges that were unrelated to the defendant's actual fuel costs. The district court dismissed the RICO claim because the plaintiff failed to plead a misrepresentation:

> [The plaintiff] argues that because the fuel and landfill surcharges levied did not correspond to actual increased charges specific to each route, the entire surcharge system was a fraudulent scheme, and this language, accompanied with the invoices on which the surcharges appeared, constituted misrepresentations. But, even accepting that the charges were not in accord with the contract, [the plaintiff's] definition of a "misrepresentation" is exceptionally broad. The contract provided for certain types of charges. The fact that those charges were possible via the terms of the contract cannot have been a misrepresentation in itself. Invoices received by customers reflected that those charges had been levied in various amounts. Neither was that a misrepresentation; it was entirely true that [the defendant] was levying fuel, landfill, and

other surcharges in those amounts.  Whether those amounts were appropriate or correct under the contract was another matter, but every incipient billing dispute is not a "misrepresentation" from the time a bill is mailed to a customer, even if the customer ultimately prevails on the merits of the dispute.  If, for example, a customer had demanded an explanation of the charges, and [the defendant] had responded with false assertions about the costs of fuel it had incurred, that would be closer to a cognizable misrepresentation.  But to hold that a wrongfully charged fee constitutes, in itself, a misrepresentation, would be to broaden the word's meaning, and the reach of RICO, past the point of meaning.  Accordingly, no misrepresentation sufficient to state claims for mail fraud or wire fraud as predicate acts has been alleged.

*Braswell Wood*, 2010 WL 3168125, at *4 (footnote omitted).

The district court in *In re Checking Acct. Overdraft Litig.*, 797 F. Supp. 2d 1323 (S.D. Fla. 2011), followed *Braswell Wood* and dismissed a RICO claim concerning overcharges for overdraft fees.  The district court stated:  "Like the *Braswell Wood* court, this Court finds that wrongful overcharges, at least under these facts and when permitted by contract, are not synonymous with the meaning of 'misrepresentation' in the context of the RICO statute.  Plaintiffs' RICO claims are the proverbial square peg in the round hole, and Plaintiffs should not be permitted to alchemize their claims for breach of contract into ones for civil RICO conspiracy." *In re Checking Acct. Overdraft Litig.*, 797 F. Supp. 2d at 1332 (footnote omitted).

Notably, in *Braswell Wood* and *In re Checking Acct. Overdraft Litig.*, the fees at issue were authorized by contract; the plaintiffs alleged that the authorized fees were assessed improperly.  Gemstone travels under a different theory.  To begin, the evidence, viewed in the light most favorable to Gemstone, indicates that Gemstone

agreed to pay Ms. Carr $0.01 per pound for meat that she sourced for RCF to portion. Ms. Carr disclosed no other fees and no other rates, except that she would charge $0.02 for small, one-off loads.  She did not mention, for example, that she might add "a couple extra pennies" to her price if she could have sold the BSB elsewhere for more money, or that she "might bill a little more" if a shipment was a "headache[]." (Doc. 525-1, p. 39, tp. 154).

And the evidence viewed in the light most favorable to Gemstone indicates that Ms. Carr was able to adjust her fee for her services without detection because of her relationship with Mr. Ensley, Gemstone's president.  Mr. Ensley concealed his romantic relationship with Ms. Carr before arranging her business relationship with Gemstone.  (Doc. 422-1, pp. 56–57, tpp. 213, 216).  A reasonable jury could find that when the president of Gemstone, entrusted with the day-to-day operation of a chicken portioning business, recommended to the company's owner his girlfriend as the company's primary chicken broker and source of credit, whose payment terms he negotiated and whose invoice payments he would oversee, he should have disclosed to the owner his romantic relationship with that broker.  A jury could consider the fact that, as Mr. Ensley's relationship with Gemstone soured towards the end of 2014, Ms. Carr suddenly acted out of character by submitting a collection of invoices totaling $1.3 million that were several weeks old, and Mr. Ensley directed Gemstone to pay the invoices.

In deciding whether Mr. Ensley and Ms. Carr/AAA colluded against Gemstone, jurors could consider the fact that Mr. Ensley and Ms. Carr convinced Mr. Turnage to not put the penny-per-pound fee agreement in writing. (Doc. 422-1, p. 34, tpp. 122–23). Mr. Turnage asked for the agreement to be put in writing, and Mr. Ensley and Ms. Carr convinced him that it was normal in the poultry industry not to use written contracts. Jurors could consider the fact that Mr. Ensley and Ms. Carr made those representations as veterans of the poultry industry, fully aware that Mr. Turnage "didn't know anything about the chicken business." (Doc. 422-18, p. 16, tp. 60).

Moreover, AAA's invoices did not disclose the fee Ms. Carr charged for each load of meat she secured for RCF to process. (Doc. 263-1, p. 7, ¶ 9; *see* Doc. 414, p. 59).[6] Mr. Turnage testified that Mr. Ensley directed Mr. Harwell to quickly pay the invoices as a matter of course. (Doc. 263-1, p. 4, ¶ 5; Doc. 422-1, pp. 30–31, tpp. 109–10). When Mr. Turnage became suspicious and asked Ms. Carr to provide detailed information about her invoices in December 2014 and January 2015, Ms. Carr/AAA refused. (Doc. 263-1, p. 7, ¶ 9). A reasonable jury could infer from this

---

[6] For each load of chicken that Ms. Carr sourced for RCF to process, Gemstone knew the UB rate and the amount the company paid AAA per pound, but Gemstone did not know AAA's cost per pound for the chicken, so Gemstone could not evaluate whether Ms. Carr actually was charging one penny per pound for the service of sourcing the chicken.

evidence that Ms. Carr concealed what she charged Gemstone for her services, and Mr. Ensley ensured she was paid whatever she decided to bill without explanation.[7]

This genuine dispute as to whether Ms. Carr, AAA, and Mr. Ensley participated in a scheme to defraud expands the plaintiffs' first RICO claim beyond a simple breach of contract theory. The overlay of the scheme to defraud aligns the plaintiffs' RICO theory more closely with the theories in *Norfolk S. Ry. Co.* and *In re Managed Care Litig.* and distinguishes the plaintiffs' first RICO claim from the claims in *Braswell Wood* and *In re Checking Acct. Overdraft Litig.*. The disputed evidence regarding the alleged fraudulent scheme means that a jury must decide whether Ms. Carr and Mr. Ensley committed two or more predicate acts of mail or wire fraud over the course of almost two years, demonstrating criminal conduct of a continuing nature.

The evidence discussed so far allows Gemstone and RCF to establish "a pattern of racketeering activity" concerning their § 1962(c) invoicing scheme claim, and that evidence similarly allows the plaintiffs to establish the first element of their § 1962(c) invoicing scheme claim – "conduct" – and the second element – "of an

---

[7] Of course, Mr. Ensley and Ms. Carr/AAA see things differently. For example, they likely would explain to a jury that, although Mr. Turnage had no experience in the chicken industry, he had plenty of experience investing in companies, especially distressed companies, and he was very familiar with traps for the unwary. Mr. Ensley and Ms. Carr/AAA also likely would explain to a jury that Mr. Turnage had accountants who fly-specked costs and production data. They likely would explain that Ms. Carr was paid quickly to maintain her line of credit, which was crucial to Gemstone's profitability. That is why there are disputed issues of fact concerning the Ensley/Carr/AAA invoicing scheme. A jury must resolve those disputes.

enterprise." Ms. Carr conducted and participated in the invoicing scheme by, at the very least, emailing the AAA invoices to Gemstone for payment. Mr. Ensley conducted and participated in the invoicing scheme by, at the very least, ensuring Gemstone paid AAA quickly. The association among Ms. Carr, AAA, and Mr. Ensley easily meets the definition of an "enterprise." *See* 18 U.S.C. § 1961(4); *Williams*, 465 F.3d at 1284. Therefore, a genuine issue of fact exists as to whether Ms. Carr, AAA, Mr. Ensley, and A&M violated § 1962(c) through the invoicing scheme.[8]

To round out the RICO private right of action based on the invoicing scheme, the plaintiffs have offered proof of injury and causation. *See Almanza*, 851 F.3d at 1066 (noting that a civil RICO plaintiff must prove "injury to business or property" and causation in addition to a violation of § 1962). The injury is the several millions of dollars that Gemstone allegedly paid Ms. Carr/AAA over the agreed penny-per-pound fee for her services. These injuries were caused by the inflated AAA invoices and Mr. Ensley's facilitation of payments. Therefore, the Court will deny the motions for summary judgment as to the § 1962(c) invoicing scheme claim as that claim pertains to Ms. Carr, AAA, Mr. Ensley, and A&M.

---

[8] A&M's role in the Ensley/Carr relationship is similar to AAA's role. Mr. Ensley asked Gemstone to pay his monthly bonuses to A&M.

The defendants other than Ms. Carr, AAA, Mr. Ensley, and A&M are entitled to summary judgment on that claim.  There is no evidence that the other defendants participated in or were even aware of the invoicing scheme.[9]

**DONE** and **ORDERED** this February 12, 2022.

_____

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE

---

[9] Gemstone and RCF cite two Gary Hill email messages in an effort to maintain their § 1962(c) invoicing scheme claim against him.  (*See* Doc. 526, pp. 10–12) (citing Doc. 525-16, p. 1; Doc. 525-17, p. 1).  Those emails prove that Gary Hill Mr. Ensley was ensuring Gemstone was paying AAA's invoices, and Mr. Hill believed it was important to pay those invoices.  That fact falls short of "participat[ion] in the operation or management of the [RICO] enterprise."  *See Reves*, 507 U.S. at 185.  The plaintiffs also cite "Gary Hill's email to Carr re: reconciliation, dated January 17, 2015, attached as Ex. 21," (Doc. 526, p. 12 n.38), but that email is not exhibit 21, and the Court cannot locate the email in the plaintiffs' evidentiary submission.  Even accepting as true the plaintiffs' quote from that email, the email does not change the outcome.