FILED

2022 Feb-14  PM 06:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **GEMSTONE FOODS, LLC et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 5:15-cv-02207-MHH** |
| | ) | |
| **AAA FOODS ENTERPRISES, INC.** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **MICHAEL ENSLEY et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 5:15-cv-01179-MHH** |
| | ) | |
| **BEN O. TURNAGE et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION – VOLUME III

### b. Section 1962(c) claim regarding the PWW/Galleria scheme

Gemstone and RCF allege that the defendants also violated § 1962(c) through

their outside work in PWW and Galleria.  The plaintiffs allege that the defendants,

through PWW and Galleria, misappropriated RCF's name and information by

1

falsifying RCF bills of lading, stole business from Gemstone by performing cross-docking or inspection services for a Gemstone customer, and embroiled the plaintiffs in a fraudulent scheme.  The plaintiffs allege wire fraud as the RICO predicate act.

The defendants contend that the statute of limitations bars claims relating to PWW's and Galleria's conduct.  (Doc. 414, pp. 134–37).  In their pleadings, Gemstone and RCF did not specifically mention PWW, Galleria, or cross-docking until they filed their third amended complaint on June 23, 2021.  (Doc. 391, pp. 28–29, ¶ 4.51).  In their third amended complaint, the plaintiffs allege that the PWW/ Galleria inspection scheme took place in 2013 and 2014.  (Doc. 391, pp. 28–29, ¶ 4.51).  Accordingly, the defendants argue that RICO's four-year statute of limitations – and the two-year statute of limitations for state law fraud claims – bars the plaintiffs' claims based on business the defendants conducted as PWW and Galleria.  (Doc. 414, p. 135).

The statute of limitations for a RICO claim based on fraud does not start to run until a plaintiff becomes aware of information that would have put a reasonable person on notice of the fraud or prompted him to investigate.  *Pac. Harbor Capital, Inc. v. Barnett Bank, N.A.*, 252 F.3d 1246, 1252 (11th Cir. 2001).[1]  "Equitable tolling

---

[1] The same rule applies for Alabama fraud claims, including fraudulent suppression claims. *See Davant v. United Land Corp.*, 896 So. 2d. 475, 491 (Ala. 2004) ("[T]he limitations period [for a fraudulent suppression claim] begins to run when the plaintiff was privy to facts which would provoke inquiry in the mind of a [person] of reasonable prudence, and which, if followed up, would have led to the discovery of the fraud.") (quoting *Auto-Owners Ins. Co. v. Abston*, 822 So. 2d 1187, 1195 (Ala. 2001)) (internal quotations omitted).

is defeated, even on summary judgment, when it is shown that indisputably the plaintiffs 'had notice sufficient to prompt them to investigate and that, had they done so diligently, they would have discovered the basis for their claims.'" *Pac. Harbor Capital*, 252 F.3d at 1252 (quoting *Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 832 (11th Cir. 1999)).

Here, Gemstone and RCF did not indisputably have notice sufficient to prompt them to investigate the PWW/Galleria inspection scheme, and their efforts in late 2014 and early 2015 to investigate other suspicious conduct did not uncover the PWW/Galleria scheme. Mr. Welborn and Mr. Pass disclosed their sideline business operations only when placed under oath in this litigation, and Mr. Wester and Eddie Hill had to be placed under oath twice before they acknowledged the services that Galleria and PWW provided for Mr. Lenoir and his company Canebrake.

To support their statute of limitations argument, the defendants rely on the December 19, 2014 email that Mr. Power sent to Mr. Turnage, which states:

> I have attached labels that were being used during cross docking for Canebreak [sic] Trading (Bill To) and Food Pro (Ship To) in the past. This is a violation of USDA regulations and would be considered knowingly mislabeling and misbranding product and could result in a withdrawal of Grant of Inspection.
>
> This was ceased immediately upon finding this violation.

(Doc. 422-129, p. 2). Mr. Turnage responded: "Thanks Jeff- I guess we need to 'inventory' our labels- Who handled most of the actual leg work on this- Matthew?

I had no idea this wasn't on the clear up and up- I am certainly glad you put a stop to it." (Doc. 422-129, p. 2).

Shortly after he arrived at Gemstone in November 2014, Mr. Power discovered labels that he thought someone at Gemstone was using to relabel boneless chicken breast as heavy fowl before the meat was shipped to Canada. (Doc. 422-12, p. 70, tpp. 268–69). Mr. Power believed that someone was shipping the meat to Gemstone to be relabeled and that the relabeling was illegal. (Doc. 422-12, pp. 70–72, tpp. 270, 274–76). Mr. Power confronted Mr. Welborn and Mr. Pass about the labeling because he had heard them mention cross-docking in weekly meetings; he told them that the relabeling had to stop. (Doc. 422-12, pp. 70–72, tpp. 268–75). While he worked at Gemstone, Mr. Power was not aware of cross-docking that Gemstone performed for Mr. Lenoir; he understood that Gemstone sold Mr. Lenoir chicken nuggets. (Doc. 422-12, p. 73, tp. 280).

The December 2014 email from Mr. Power to Mr. Turnage shows that Mr. Turnage received notice that labels previously used in connection with cross-docking involving "Canebreak [sic] Trading" and "Food Pro" violated USDA regulations and that the violation ended once it was detected. The evidence shows that Mr. Power, who was new to Gemstone in November 2014, believed that the relabeling was being done by Gemstone employees as part of Gemstone's business, and he believed that he stopped the illegal conduct after he addressed it with Mr. Welborn and Mr. Pass.

4

Viewed in the light most favorable to the plaintiffs, that information is not indisputably sufficient to prompt Gemstone to investigate whether its employees were operating an independent secret inspection business at truck stops that involved labeling and fraudulent RCF bills of lading.

Even if the email was sufficient to prompt Gemstone to investigate further, it is disputable whether Gemstone would have discovered the PWW/Galleria truck stop inspection business that Mr. Pass, Mr. Welborn, and Mr. Wester – and sometimes Eddie Hill – secretly operated. These defendants deliberately concealed their inspection business by operating through personal email accounts and deleting messages on the occasions when they used their Gemstone email accounts. Instead of openly using RCF labels, these defendants either took discarded labels from the trash or secretly created labels for their Galleria/PWW work. It is unlikely that Mr. Welborn, Mr. Wester, or Mr. Pass would have shared information about PWW had Mr. Turnage, Mr. Power, or someone else from Gemstone asked for additional information about the labels in 2014. Because Mr. Welborn, Mr. Pass, and Mr. Wester were using fraudulent RCF bills of lading in their sideline inspection business, jurors reasonably could infer that none of the partners in PWW would have acknowledged the business if Gemstone had tried to learn more about the labels that Mr. Power described in his December 2014 message. Jurors reasonably could infer that Mr. Wester would not have disclosed the PWW business in 2014, given the fact

that he "dodged" (to be charitable) questions about PWW under oath in his first deposition.[2]   Eddie Hill had not worked with Gemstone for nearly a year when Mr. Power discovered the illegal labels, and Eddie Hill did not mention Galleria in his first deposition when he was under oath.   He was not likely to disclose the defendants' Galleria business to Gemstone or RCF.

And, when Mr. Turnage became suspicious about possible misconduct in November 2014, Gemstone hired a private investigator to interview several of the defendants, including Mr. Wester, and none disclosed the PWW/Galleria inspection business in their interviews.   On this record, the defendants have not established that, as a matter of law, Gemstone should have done more in 2014 or that Gemstone would have discovered PWW/Galleria's mislabeling business had Gemstone done more in 2014.   Therefore, neither RICO's four-year statute of limitations nor Alabama's two-year statute of limitations bars the plaintiffs' claims regarding the PWW/Galleria fraud scheme.

Turning to the merits, Gemstone and RCF allege wire fraud as the RICO predicate act for the PWW/Galleria scheme, so, as with their claim based on the invoicing scheme, the plaintiffs must offer evidence of a scheme to defraud under the wire fraud statute.   Again, a "scheme to defraud" under the wire fraud statute

---

[2] In his first deposition, Mr. Wester testified that he was not familiar with a company called PWW even though PWW stands for "Pass Welborne Wester," and Mr. Wester, together with Mr. Pass and Mr. Welborn, had opened a bank account for PWW.

"involves the making of misrepresentations intended and reasonably calculated to deceive persons of ordinary prudence and comprehension." *Beck v. Prupis*, 162 F.3d 1090, 1095 (11th Cir. 1998). From the evidence in the summary judgment record, reasonable jurors could conclude that the PWW/Galleria defendants – Mr. Wester, Mr. Pass, Mr. Welborn, and Eddie Hill – participated in a scheme to defraud by violating their duty to disclose material information to Gemstone and RCF.

For purposes of the wire fraud statute, a duty to disclose may be inferred from the relationship between the parties and the nature of the alleged fraud. *Langford v. Rite Aid of Ala., Inc.*, 231 F.3d 1308, 1312–13 (11th Cir. 2000). The Eleventh Circuit has explained:

> Our own precedent tends to support ["that a duty to disclose can be inferred by the relationship between the parties, and need not be formalized through a statute or regulation."] *See United States v. Brown*, 79 F.3d 1550, 1557 [(11th Cir. 1996)] ("[C]ertain people must always disclose facts where non-disclosure could result in harm. This circumstance exists when there is a special relationship of trust, such as a fiduciary relationship between people"); *United States v. Ballard*, 663 F.2d 534 (5th Cir. Unit B Dec. 1981), *modified in part on other grounds*, 680 F.2d 352 (1982) (duty to disclose may be imposed by federal or state statute or may arise from the relationship itself). The texts of the mail and wire fraud statutes are also informative, in that they do not include any language indicating that an independent duty to disclose is necessary for liability under their terms. *See* 18 U.S.C. §§ 1341, 1343.
>
> . . .
>
> Plaintiffs are correct in their assertion that concealment of critical data, even without a formalized duty to disclose that data, can constitute mail and/or wire fraud in certain situations. Schemes to defraud can take many forms . . . ; the complexity of transactional relationships is such

7

that duties to disclose may exist in other situations if the transaction is to be legitimate.  We can envision many situations in which a failure to disclose information could constitute fraud pursuant to 18 U.S.C. §§ 1341 and 1343, even when no duty to disclose exists independently.  Determinations as to whether a duty to disclose information exists must be made on a case by case basis, with appropriate attention given to the nature of the transaction and the relationship between the parties.

*Langford*, 231 F.3d at 1312–13 (finding on the record in that case that the pharmacy did not owe its uninsured customers a duty to disclose that it charged them more for prescription drugs because the customers were incentivized to seek and use price information on the open market, and the pharmacists' code of conduct did not require them to disclose pricing policies).

Here, a jury may reasonably infer from the evidence that the PWW/Galleria defendants had a duty to disclose information about PWW and Galleria to Gemstone and RCF.  First, Mr. Wester, Mr. Pass, and Mr. Welborn were employed by Gemstone while they were operating PWW and working for Galleria, so they owed Gemstone at least a minimum level of loyalty.  *See QORE Prop. Scis., Inc. v. Civil Sols., Inc.*, No. CV-03-S-2755-NE, 2006 WL 8437067, at *22–23 (N.D. Ala. Mar. 2, 2006) (discussing the "common law principles of the agent-principal relationship" establishing "an agent's duty to act, in all circumstances, with due regard for the interests of his principal, and to act with the utmost good faith and loyalty") (quoting *Allied Supply Co., Inc. v. Brown*, 585 So. 2d 33, 37 (Ala. 1991)).  And these were not just any employees; Mr. Wester was first Gemstone's shipping/receiving

8

manager and later its QA manager, Mr. Pass its director of technical services, and Mr. Welborn its general manager.  2006 WL 8437067, at \*22–23 (recognizing employees' managerial statuses as evidence of a common law duty of loyalty).[3]

Eddie Hill had just left Gemstone when he went into business with Mr. Welborn, Mr. Wester, and Mr. Pass.  He knew that they were Gemstone employees, and he was very knowledgeable about Gemstone's business because he had served as Gemstone's controller through his accounting firm until January 2014.  Mr. Welborn testified that his first conversation with Eddie Hill about Mr. Lenoir's business could have occurred in December 2013 before Eddie Hill stopped working for Gemstone,[4] and Eddie Hill testified that he suspected the conversation occurred in either early January 2014 or late December 2013.  Even if the conversation occurred in January 2014, that still would be nearly simultaneous with Eddie Hill leaving Gemstone and Galleria opening a facility to begin providing services to Mr. Lenoir's company, Canebrake.  So, evidence viewed in the light most favorable to the plaintiffs shows that Eddie Hill's relationship with Gemstone required him to disclose his business relationship with Messrs. Welborn, Wester, and Pass.

---

[3] To be clear, the Court is not making findings of fact with respect to any causes of action for breaches of fiduciary duties or the duty of loyalty under Alabama law.  Rather, the Court is identifying facts concerning the relationship between the parties that, under *Langford*, are circumstantial evidence of a special relationship giving rise to a duty to disclose.

[4] Mr. Welborn more consistently testified that he thought his conversation with Eddie Hill occurred in January 2014 after Eddie Hill left Gemstone. (*See* Doc. 422-4, pp. 31–32, tpp. 120, 122–23). So, a genuine issue of timing exists.

More importantly, the "nature of the transaction" factor from *Langford* overwhelmingly supports a duty to disclose in this case. The undisputed falsified RCF bills of lading that were part of Galleria's and PWW's transactions with Mr. Lenoir and Canebrake tied RCF to meat shipments of which RCF and Gemstone were not aware and implicated RCF in a labeling scheme that drew the attention of Canadian customs authorities and the USDA, threatening Gemstone's operating permits.[5] The obligation of managerial employees to refrain from exposing their employer to harm requires little explanation. Therefore, there is a genuine dispute as to whether Mr. Wester, Mr. Pass, Mr. Welborn, and Eddie Hill, for purposes of the wire fraud statute, concealed material information about PWW and Galleria from Gemstone in violation of their duty disclose arising from the parties' special relationship.

To proceed with their RICO wire fraud claim concerning the Galleria/PWW scheme, Gemstone and RCF must identify disputed evidence of damages proximately caused by the cross-docking/inspection scheme. *See Sikes v. Teleline,*

---

[5] As information about the Galleria and PWW operations unfolded in depositions, Mr. Welborn explained that the USDA eventually shut down the inspection business that Eddie Hill, Mr. Welborn, Mr. Wester, and Mr. Pass took with them to FFF. Following Mr. Welborn's deposition, Gemstone's attorney asked for a copy of the USDA letter regarding the termination of this business. Counsel for the defendants objected because the USDA sent the letter in 2017, two years after the defendants departed from Gemstone. At the Court's direction, the defendants have recently produced the letter for *in camera* inspection. If the Court determines that the letter is subject to discovery, then Gemstone and RCF may request permission to add the letter to the evidentiary record, and the defendants may have an opportunity to respond.

*Inc.*, 281 F.3d 1350, 1360–61 (11th Cir. 2002), *abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008).  For Gemstone and RCF, proof of damages is difficult from a lost-damages perspective because so little of the work performed by Galleria and PWW was legitimate cross-docking work.  Viewed in the light most favorable to the plaintiffs, it appears that Galleria may have performed legitimate cross-docking services for Canebrake three times in April and May of 2014.  (Doc. 454-17, p. 1) (invoice numbers 2017–19).  Galleria earned close to $18,000 for the work.[6]  Gemstone and RCF may claim lost profits for any legitimate cross-docking work that Mr. Welborn, Mr. Wester, and Mr. Pass steered away from Gemstone while the men were working for Gemstone.  *Allied Supply Co., Inc. v. Brown*, 585 So. 2d 33, 37 (Ala. 1991) (explaining that an agent must "act, in all circumstances, with due regard for the interests of his principal, and to act with the utmost good faith and loyalty," and must not "subvert the principal's business by luring away customers . . . or [] otherwise act in any manner adverse to the principal's interest.").

Reasonable jurors could conclude that the balance of the work that Galleria and PWW performed for Mr. Lenoir was not legitimate cross-docking but instead

---

[6] Again, legitimate cross-docking involves the movement of loads of meat from one truck to another for various reasons.  Mr. Power described examples of legitimate cross-docking in his deposition.  For instance, Gemstone might order a load of meat that it would break down, repackage, and transport per a customer's directions. (Doc. 422-12, pp. 70, 72, tpp. 267, 275–76); *see also* Doc. 419-1, p. 39, tpp. 149–50; Doc. 422-3, p. 11, tp. 40).

was illegitimate "inspection" work through which Galleria and PWW mislabeled chicken for Canebrake and issued false RCF bills of lading.  Jurors could consider, for example, that cross-docking requires a dock, but Mr. Welborn admitted that, in time, he, Mr. Pass, and Mr. Wester realized that they did not need a dock for Canebrake's work.  (Doc. 422-4, p. 31, tpp. 119–20).  For that reason, PWW began performing its two-to-three-minute inspections for Canebrake at truck stops, and Canebrake paid upwards of $5,000 for each inspection, meaning $2,000 to $3,000 per minute.  (Doc. 454-17).  Mr. Wester testified that PWW had no expenses.  (Doc. 454-5, p. 14, tp. 54).  Add to that the admittedly fraudulent RCF bills of lading and labels that no one can recall, a shipment that Canadian customs authorities rejected at the border for mislabeling, Mr. Wester's inability in his first deposition to recall a company named for him, and Eddie Hill's failure to mention Galleria at his first deposition when he reviewed emails and RCF bills of lading that Mr. Wester sent to him, Mr. Pass, and Mr. Lenoir, and jurors reasonably could conclude that whatever PWW/Galleria actually was doing was at best suspicious work and at worst illegal work that Gemstone and RCF would not want to perform for Mr. Lenoir and Canebrake.

By placing fake RCF bills of lading in the poultry supply chain and using fraudulent labels that seem to have included RCF's establishment number, which enabled Canadian Customs and the USDA to trace a mislabeled load of poultry back

to RCF, Galleria and PWW exposed Gemstone and RCF to significant liability. (Doc. 422-129, p. 2). A reasonable jury could infer that associating RCF with Galleria's and PWW's questionable inspection work caused concrete injuries to Gemstone's business reputation. Because jurors reasonably could conclude that associating RCF, through false bills of lading and use of RCF's establishment number, with an illegitimate labeling operation was reprehensible conduct, jurors could assess punitive damages against Eddie Hill, Mr. Welborn, Mr. Pass, and Mr. Wester. *See Kemp v. Am. Tel. & Tel. Co.*, 393 F.3d 1354, 1363 (11th Cir. 2004) (finding that the reprehensibility of a RICO wire fraud scheme justified an award of punitive damages when the defendant's conduct was deceitful, involved repeated actions, and targeted financially vulnerable individuals).[7]

So, Gemstone and RCF have shown a genuine issue of substantive violations of the wire fraud statute, causation, and damages, and have therefore shown a

---

[7] With respect to punitive damages, given the nature of Galleria's and PWW's operations, if jurors were to return a small award of compensatory damages for injury to RCF's business reputation, this may not be a situation in which due process would require a 3:1 ratio of punitive to compensatory damages. *See BMW of N. Am. v. Gore*, 517 U.S. 559, 582 (1996) ("[L]ow awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine."); *see also TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 460 (1993) ("Taking account of the potential harm that might result from the defendant's conduct in calculating punitive damages [is] consistent with the views we expressed in [*Pac. Mut. Life Ins. Co. v.*] *Haslip*[, 499 U.S. 1 (1991)]. In that case we endorsed the standards that the Alabama Supreme Court had previously announced, one of which was 'whether there is a reasonable relationship between the punitive damages award and *the harm likely to result* from the defendant's conduct as well as the harm that actually has occurred,' [*Haslip*], 499 U.S., at 21, 111 S. Ct., at 1045 (emphasis added).").

genuine issue of material fact as to a RICO predicate act concerning the Galleria/PWW scheme. PWW and Galleria operated for at least two years and issued many fake RCF bills of lading, so the plaintiffs also have produced evidence of a pattern of racketeering activity that demonstrates criminal conduct of a continuing nature. To round out the § 1962(c) claim based on PWW and Galleria, the PWW/Galleria defendants all were parties to email messages and shared in the profits of their sideline inspection business that enabled Mr. Lenoir to ship poultry to Canada. This is actionable conduct of an enterprise under RICO.

Therefore, the Court will deny the defendants' motions for summary judgment as to the § 1962(c) claim against Mr. Wester, Mr. Pass, Mr. Welborn, and Eddie Hill based on the PWW/Galleria scheme. Because there is no evidence that other defendants participated in PWW or Galleria or were aware of the inspection scheme, the Court will enter judgment for all other defendants on that claim.

**DONE** and **ORDERED** this February 14, 2022.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE